FILED
DALLAS COUNTY
6/6/2017 3:58:33 PM
FELICIA PITRE
DISTRICT CLERK

Christi Underwood

CAUSE NO. DC-17-06672

| | | |
|---|---|---|
| RAIDER MARKETING, LP, | § | IN THE DISTRICT COURT OF |
| EXCO RESOURCES, INC., | § | |
| EXCO OPERATING COMPANY, LP, | § | |
| and EXCO LAND COMPANY, LLC, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| CHESAPEAKE ENERGY MARKETING, | § | |
| LLC | § | |
| | § | |
| **Defendant.** | § | _____ JUDICIAL DISTRICT |



## PLAINTIFFS' VERIFIED ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

Raider Marketing, LP ("Raider"), EXCO Resources, Inc. ("EXCO Resources"), EXCO Operating Company, LP ("EXCO Operating"), and EXCO Land Company, LLC ("EXCO Land" and, with EXCO Operating and EXCO Resources, collectively "EXCO") file this Verified Original Petition and Application for Temporary Restraining Order and Temporary Injunction against Chesapeake Energy Marketing, LLC ("Chesapeake" or "CEML") and in support show:

### I.   INTRODUCTION

1.   Raider is an affiliate of EXCO Resources, an oil and natural gas company headquartered in Dallas, Texas. Raider and Chesapeake are parties to a Base Contract for Sale and Purchase of Natural Gas ("Base Contract"). The Base Contract and a related agreement—Transaction Confirmation #7 (together, the "Contracts")—outline a process whereby Chesapeake buys gas delivered by Raider at specified delivery points, from April 2013 until June 2032, and Raider pays Chesapeake for Chesapeake's costs associated with transporting and processing the gas under a mutually agreed upon price/cost structure. Because the gas at issue is produced as a by-product of oil production, and the costs of transporting and processing the gas exceed its

value, Raider—despite selling the gas to Chesapeake—also pays Chesapeake under the agreed price/cost structure.

2.     Chesapeake now wants to walk away from the Contracts because it is unhappy with the price/cost structure that it previously agreed to.  In an effort to force Raider to renegotiate the price/cost structure and duration of the Contracts, Chesapeake is attempting to hold up the impending $300 million sale of EXCO Resources' South Texas oil and natural gas properties (including the Contracts between Raider and Chesapeake) by unreasonably withholding consent and seeking to terminate the Contracts on improper grounds.

3.     Chesapeake attempts to excuse its unlawful conduct by pointing to Section 10.1 of the Base Contract, which allows Chesapeake to seek adequate financial assurance of Raider's ability to perform under the Contracts.  But that provision conditions Chesapeake's right to demand adequate assurance on the existence of *reasonable* grounds for any alleged insecurity, and Chesapeake has none.

4.     Chesapeake also tries to rely on Section 14.1, which requires Chesapeake's consent for certain assignments or transfers to third parties, to object to Raider's exercise of rights under the Contracts and to the assignments for EXCO Resources' pending transaction. That provision, however, lets Chesapeake withhold consent to the assignment of the contracts to third parties only if doing so is reasonable.  Chesapeake has not provided any reasonable basis for either withholding or delaying its consent.

5.     Chesapeake's conduct also has caused and will continue to cause severe and irreparable harm to Raider and EXCO.  In purporting to terminate the Contracts, Chesapeake ordered Raider's gas to be shut-in.  Because EXCO cannot produce oil without producing and transporting (or otherwise disposing of) the natural gas associated with oil production,

Chesapeake's refusal to purchase Raider's gas has forced a large number of EXCO's oil-producing wells to be shut-in—dramatically lowering EXCO's oil production—and required Raider's gas to be wasted through "flaring."

6.      Beyond the substantial harm wreaked on Raider's and EXCO's operations, Chesapeake's conduct also has derailed the sale of EXCO's South Texas oil and gas properties, which was scheduled to close on June 1, 2017.   The delay and potential loss of this unique business opportunity—critical to EXCO's and Raider's operations and business strategy—threatens additional, imminent, and irreparable harm to Raider and EXCO.

7.      Through this lawsuit, Plaintiffs seek damages based on Chesapeake's improper conduct and breaches of contract and the implied covenant of good faith and fair dealing. Plaintiffs also seek a temporary restraining order and a temporary injunction to maintain the status quo pending a final judgment and ruling on the merits of Plaintiffs' claims.

## II.      DISCOVERY CONTROL PLAN

8.      Plaintiffs request that discovery be conducted in accordance with a Level 3 discovery plan pursuant to Rule 190.4 of the Texas Rules of Civil Procedure.  Plaintiffs also seek an expedited trial in this case.

## III.      THE PARTIES

9.      Plaintiff Raider Marketing, LP is a Delaware limited partnership with its principal place of business at 12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

10.      Plaintiff EXCO Resources, Inc. is a Texas corporation with its principal place of business at 12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

11.      Plaintiff EXCO Operating, LP is a Delaware limited partnership with its principal place of business at 12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

12.     Plaintiff EXCO Land, LLC is a Delaware limited liability company with its principal place of business at 12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

13.     Defendant Chesapeake Energy Marketing, LLC is an Oklahoma limited liability company with its principal place of business at 6100 N. Western Avenue, Oklahoma City, Oklahoma.   Chesapeake can be served with process by serving its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

## IV.     JURISDICTION AND VENUE

14.     The damages sought in this case are within the jurisdictional limits of this Court.

15.     This Court has personal jurisdiction over Chesapeake because Chesapeake has extensive contacts in Texas and transacts extensive business in Texas such that it is essentially at home here.  Chesapeake also buys, sells, and markets natural gas in Texas, including the gas at issue in this case.  Moreover, this dispute arises out of Chesapeake's contacts with Texas such that it should have reasonably anticipated being sued in Texas, and litigating in Texas will not offend traditional notions of fair play and substantial justice.

16.     Plaintiffs seek monetary relief in excess of $1,000,000.00 along with non-monetary relief.

17.     Venue is proper in Dallas County, Texas pursuant to Section 15.002 of the Texas Civil Practice & Remedies Code because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here.

## V.     BACKGROUND

18.     On September 1, 2009 the Base Contract was executed by EXCO Production Company, LP, as seller, and Chesapeake, as buyer.  The Base Contract outlines the terms by which the parties buy and sell natural gas delivered to Chesapeake's receipt points.  Specific details regarding these transactions, including the quantities, duration, and purchase price paid by

Chesapeake, are further specified in transaction confirmations exchanged by the parties under the terms of the Base Contract. A true and correct copy of the Base Contract is attached hereto as Exhibit A.

19. Here, Transaction Confirmation #7, covering deliveries between April 1, 2013 and June 30, 2032, sets the price/cost structure for gas purchased and identifies the delivery points. Because the fixed quantity of gas subject to Transaction Confirmation #7 is "All available at Delivery Point," Chesapeake is the exclusive purchaser of Raider's gas at the specified delivery points, which are on a single pipeline operated by Williams Midstream Gas Management ("Williams Midstream"). A true and correct copy of Transaction Confirmation #7 is attached hereto as Exhibit B.

20. Because of their remote location, the pipeline operated by Williams Midstream is the only pipeline that services the gas wells that produce Raider's gas.

**A. Raider, An Affiliate of EXCO, Succeeds To The Base Contract After An Internal Reorganization In 2016**

21. On October 7, 2016, EXCO Operating[1] notified Chesapeake that the Base Contract and associated Transaction Confirmations were now held and administered by Raider as the result of an internal merger. A true and correct copy of this letter is attached hereto as Exhibit C.

22. Section 14.1 of the Base Contract permits a party to "transfer its interest to any parent or affiliate by assignment, merger or otherwise without the prior approval of the other party."

23. Chesapeake did not object to the notice of transfer to Raider.

---

[1] EXCO Operating had previously succeeded to EXCO Production Company, LP's rights and obligations under the Base Contract and Transaction Confirmation #7.

**PLAINTIFFS' ORIGINAL PETITION AND APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**          Page 5

24.     The parties continued to perform under the Contracts after Raider, following the merger, became the seller.  Chesapeake paid Raider directly for the gas it purchased.

25.     Notably, Chesapeake also purchases from Raider the oil produced in conjunction with Raider's gas, and never objected to Raider becoming the seller of the oil from these wells.

**B.     Plaintiff Seeks Chesapeake's Consent For Assignment To VOG Palo Verde LP In 2017**

26.     Over six months later, on April 13, 2017,[2] Raider wrote to Chesapeake requesting consent to assign the Base Contract and Transaction Confirmation #7 to a third party, VOG Palo Verde, LP ("VOG").  VOG is a subsidiary of Venado Oil and Gas, LLC, an affiliate of KKR & Co., L.P.—one of the world's largest private equity firms—that has agreed to purchase the South Texas oil and natural gas properties of EXCO Operating and EXCO Land, subsidiaries of EXCO Resources, including the Base Contract and Transaction Confirmation #7, for approximately $300 million (the "VOG Transaction").[3]

27.     Raider provided Chesapeake with information regarding the VOG Transaction and requested consent by May 12th.  A true and correct copy of this letter is attached hereto as Exhibit D.

28.     Raider asked for Chesapeake's consent because Section 14.1 of the Base Contract provides: "No assignment of this Contract, in whole or in part, will be made without the prior written consent of the non-assigning party (and shall not relieve the assigning party from liability hereunder), which consent will not be unreasonably withheld or delayed[.]"

---

[2] Unless otherwise noted, events pled herein occurred in 2017.
[3] Raider is not a party to the purchase and sale agreement between EXCO Operating, EXCO Land, and VOG, but Raider is a party to the assignment of the Contracts.

PLAINTIFFS' ORIGINAL PETITION AND APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION                Page 6

29.     Although Chesapeake continued to purchase Raider's gas, Chesapeake has never responded to Raider's request.   As a result, Chesapeake is unreasonably and in bad faith withholding consent in an effort to gain leverage to renegotiate its contracts with Raider.

**C.     In Hopes Of Terminating The Contracts, Chesapeake Demands $25 Million Irrevocable Standby Letter Of Credit From EXCO On 48 Hours' Notice**

30.     On Thursday, May 25th, before the Memorial Day holiday weekend, despite knowing that the Base Contract and Transaction Confirmation #7 would be sold to VOG in the VOG Transaction scheduled to close on June 1st, Chesapeake wrote to EXCO Operating—not Raider—stating that, pursuant to Section 10.1 of the Base Contract, "CEML has reasonable grounds for insecurity regarding EXCO [Operating's] performance of obligations under the [Base Contract]."  The letter went on to demand a $25 million irrevocable standby letter of credit from *EXCO Operating* within 48 hours and threatened that "Should Credit Assurance not be delivered to CEML's satisfaction within 48 hours of receipt, CEML may terminate one or more of the Transaction Confirmations associated with the Contract."   A true and correct copy of Chesapeake's letter is attached hereto as Exhibit E.

31.     Chesapeake gave no basis for its "reasonable grounds for insecurity," and there were none.  EXCO Operating, and then Raider, had delivered gas without fail.  Moreover, EXCO Operating no longer held or administered the Contracts, so its financial status was irrelevant (1) absent a showing of Raider's inability to perform and (2) in light of the pending sale to VOG. And the amount of $25 million was equally unreasonable given the economics and history of the Contracts.

32.     Importantly, Chesapeake incorrectly addressed its demand letter to EXCO Operating even though it knew that Raider was the appropriate party to receive any notice under

the Base Contract. *See* Ex. C (October letter). Indeed, by the time Chesapeake sent its demand

letter, it had been purchasing gas from Raider for almost eight months.

33.     There were no new or recent developments to support Chesapeake's unspecified

concerns about the financial insecurity of Raider or EXCO Operating.

34.     The day after it received Chesapeake's letter, on Friday, May 26th, EXCO

Operating informed Chesapeake in writing that Chesapeake's demand for adequate assurance

was incorrectly addressed to EXCO Operating and should have been addressed to Raider.

EXCO Operating attached a copy of the October 7, 2016 letter notifying Chesapeake of the

internal merger that caused Raider to hold and administer the Contracts. A true and correct copy

of EXCO Operating's May 26th letter is attached hereto as Exhibit F.

35.     On Tuesday, May 30th,[4] Chesapeake again wrote to EXCO Operating, claiming

for the first time that it did not recognize Raider as a party to the Base Contract and that Raider's

relationship to EXCO was unclear—even though Chesapeake had been purchasing oil and gas

from Raider for some time.[5]  Chesapeake then went on to repeat its unspecified "reasonable

grounds for insecurity" as to EXCO Operating and asserted the same unelaborated concern as to

Raider, threatening this time to terminate one or more transaction confirmations if the $25

million irrevocable standby letter of credit was not provided on the same day. A true and correct

copy of Chesapeake's May 30th letter is attached hereto as Exhibit G.

36.     Chesapeake offered no reasons for its ostensible—and plainly fabricated—belief

that it can refuse to recognize Raider's relationship to the Base Contract and Transaction

---

[4] Monday, May 29th was Memorial Day.
[5] The Contracts were originally executed by EXCO Production and Chesapeake Energy Marketing, *Inc.* ("CEMI").
At some point—and without notice to EXCO or Raider—CEMI transferred its interests in the Contracts to CEML.
Yet, EXCO Operating and Raider continued performing under the Contracts, treating CEML as the proper buyer.

**PLAINTIFFS' ORIGINAL PETITION AND APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**                    Page 8

Confirmation #7. The plain language of Section 14.1 of the Base Contract gives Chesapeake no say over transfers to parents or affiliates.

37.     Chesapeake again gave no explanation whatsoever for its demand for a $25 million letter of credit, which is unreasonable both under the circumstances and per industry norms. In the oil and gas industry, letters of credit are typically used to provide *temporary* financial security for 60 to 90 days, after which time contracts generally are terminated if the party that provided the letter of credit remains unable to perform. Under the Contracts, moreover, Chesapeake's monthly credit exposure to Raider is approximately $1 million. In demanding a $25 million letter of credit, then, Chesapeake essentially demanded that Raider put up 25 *months'* worth of performance within 48 hours.

**D.     Chesapeake Purports To Terminate Transaction Confirmation #7 For Lack Of Adequate Assurances Of Financial Responsibility By EXCO Operating.**

38.     On Wednesday, May 31st, Chesapeake sent a letter to EXCO Operating purporting to terminate Transaction Confirmation #7 because EXCO Operating had not provided a $25 million letter of credit, as Chesapeake had demanded the previous Thursday. A true and correct copy of Chesapeake's May 31th letter is attached hereto as Exhibit H.

39.     EXCO Operating responded the same day to tell Chesapeake that it had again incorrectly addressed its letter to EXCO Operating and stating that "all future notices and communications regarding the [Base] Contract and Transaction [Confirmation] #7" should go to Raider. A true and correct copy of EXCO's May 31st response letter is attached hereto as Exhibit I.

40.     Later that day, Chesapeake wrote back to EXCO Operating and—for the first time—to Raider, again declining to recognize Raider as a party to the Base Contract and

restating that Chesapeake had terminated Transaction Confirmation #7 earlier in the day. A true and correct copy of Chesapeake's second May 31st letter is attached hereto as Exhibit J.

**E.     Chesapeake Forces The Closure Of Receipt Points On The Williams Midstream Pipeline, Cutting Off A Significant Volume Of Production.**

41.     Also on May 31st, Chesapeake instructed Williams Midstream to immediately close all receipt points on the gathering system for gas from Plaintiff.

42.     Because gas is a byproduct of oil production, this conduct necessarily caused many of EXCO's oil wells to be shut-in, cutting off a significant volume of EXCO's oil production.

43.     Moreover, the abrupt shut-in of more than 70 wells required EXCO to scramble company and third-party resources on an emergency basis—a highly complex and risk-laden process—and to "flare" explosive sour gas. These efforts are ongoing.

44.     EXCO and Raider tried to reach a limited agreement with Williams Midstream in an attempt to mitigate the risks occasioned by Chesapeake's conduct but Chesapeake warned Williams Midstream that it would be punished for doing so.

**F.     Raider Demonstrates Adequate Assurance By Offering A Letter Of Credit, But Chesapeake Refuses To Accept It.**

45.     On Thursday, June 1st, Raider responded to Chesapeake's letter from the day before and notified Chesapeake that it would post a letter of credit to satisfy Chesapeake's demand for adequate assurance. Raider asked Chesapeake to confirm the amount it desired. A true and correct copy of this email is attached hereto as Exhibit K.

46.     Raider received no response, but completed an application for an irrevocable standby letter of credit for $25 million from JPMorgan Chase Bank, N.A.

47.     That evening, however, Chesapeake's employee and representative, Sarika Jewell, called Raider's President and left a voicemail stating that—despite its previous representations—

Chesapeake would *not* accept a letter of credit from Raider and that Raider should "save [its] monies." Rather, Chesapeake would "entertain" a "commercial solution" to Raider "continuing to sell [its] gas." In other words, Chesapeake wanted to renegotiate terms of Transaction Confirmation #7, and was unconcerned with the "adequate assurance" previously demanded.

48.     Jewell's voicemail establishes the fabricated nature of Chesapeake's invocation of the Base Contract's "Adequate Assurance" provision and professed confusion over whether Raider has rights under the contracts. Transcribed, the voicemail appears to read in full:

> Hey Steve [Estes, President of Raider]. This is Sarika Jewell with Chesapeake. I'm calling regarding the letter that you guys, uh, just sent. Um, I was hoping to connect with you. Uh, we will not be responding, just keep back and forth, uh, with another letter. Uh, we have a very strong, lot of evidence as to why your arguments are invalid. I can give you very specific examples if needed. Uh, we would really save you guys save, uh, monies and not, uh, bother to post the LC because we will not be accepting it. If you want to talk any commercial solution in continuing to sell your gas, uh, we will entertain that, uh, but I think it's best that we get on a call and discuss this further. So, uh, if you're interested, uh, please give me a call on my, um, office number. You can reach me at my cell as well. Thanks.

49.     As established by a proposed Transaction Confirmation #8 sent by Chesapeake to Raider on May 31st, Chesapeake's proposed "business solution" is to force Raider, among other things, to forego the 15 years remaining on Transaction Confirmation #7 and instead deal with Chesapeake on a month-to-month basis with Chesapeake having "sole discretion" to extend it for another month. A true and correct copy of the Chesapeake's email transmitting the proposed Transaction Confirmation #8 is attached hereto as Exhibit L.

50.     Despite Chesapeake's admission of its true motives and withdrawal of its demand for adequate assurance, Raider continued processing the letter of credit.

**G.     Chesapeake Has Not Responded To Raider's April 13th Request For Consent To Assign the Contracts to VOG.**

PLAINTIFFS' ORIGINAL PETITION AND APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION                Page 11

51.     Also on June 1st, Raider sent a letter to Chesapeake regarding Chesapeake's continued failure to respond to Raider's April 13th request for consent to assign the Base Contract and Transaction Confirmation #7 to VOG.  As explained in the letter, Plaintiff learned through VOG that Chesapeake had discussed the VOG Transaction with VOG on May 30th and May 31st, and informed VOG that Chesapeake would not consent to the proposed sale and assignment of Raider's rights in the contracts.

52.     Although it never responded to Raider, Chesapeake allegedly informed VOG that it was refusing consent based on (1) now unspecified credit concerns relating to *VOG* and (2) the purported failure of VOG to provide Chesapeake with a copy of the form of assignment of the Base Contract and Transaction Confirmation #7.  A true and correct copy of Raider's June 1st letter is attached hereto as Exhibit M.

53.     Importantly, Raider learned that Chesapeake refused to consent even after VOG not only offered adequate assurance of performance in the form of a $9 million standby irrevocable letter of credit and, if requested, a guarantee—at least *nine months'* worth of performance under the Contracts—and even though VOG *did* provide Chesapeake the form of assignment of the Base Contract and Transaction Confirmation #7.

54.     In an effort to obtain improper leverage to renegotiate Transaction Confirmation #7, Chesapeake was desperate to seize on any pretext to refuse its consent to the proposed assignment of the Contracts to VOG.

55.     Chesapeake's conduct, described above, is in breach of its obligation under Section 14.1 of the Base Contract to not unreasonably withhold or delay its consent to an assignment.  Instead, Chesapeake breached its implied covenant of good faith and fair dealing, and abused its contractual right to consent to an assignment in hopes of forcing Raider to

renegotiate Transaction Confirmation #7, under the threat of Chesapeake purportedly terminating Transaction Confirmation #7 and thereby killing the VOG Transaction.

56.     Absent Chesapeake's manufactured "Event of Default," the Base Contract's general termination provisions in Section 12 require Chesapeake to honor Transaction Confirmation #7 "until the expiration of the latest Delivery Period"—i.e., until June 30, 2032.

**H.      Chesapeake's Conduct Irreparably Harms And Continuously Damages Plaintiffs.**

57.     Plaintiffs have suffered, and will continue to suffer, continuous and ongoing harm as a direct result of Chesapeake's sudden and unexpected purported termination of the Contracts, its refusal to accept any of Raider's gas at the delivery points, and its instruction to Williams Midstream to close the receipt points for Raider's gas.

58.     As a result of Chesapeake's conduct, the VOG Transaction did not close on June 1st and *will not close* if the purported termination is allowed to stand.  Additionally, Raider cannot sell any of the gas that Chesapeake agreed to purchase, and EXCO Resources cannot produce oil from its shut-in wells.

59.     Moreover, Chesapeake's unreasonable and improper refusal to consent to the proposed transfer of Transaction Confirmation #7 and the Base Contract to VOG threatens the VOG Transaction, currently worth approximately $300 million.

60.     In sum, Chesapeake's continuing refusal to abide by the terms of the Base Contract's assignment provisions as well as its abuse of the financial responsibility provisions irreparably harms Plaintiffs by denying them the ability to maintain, exercise, and assign their valuable contractual rights and by interfering with the VOG Transaction.

## VI.    CAUSES OF ACTION

### A.    Breach Of Contract (By Raider Against Chesapeake)

61.    Plaintiffs adopt and incorporate their allegations set forth above.

62.    Section 10.1 of the Base Contract states that "If either party . . . has reasonable grounds for insecurity regarding the performance of any obligation under this Contract . . . by the other party . . . [that party] may demand Adequate Assurance of Performance."

63.    Chesapeake demanded Adequate Assurance of Performance from EXCO Operating, and eventually, Raider, without specifying—and, in fact, without having—any reasonable grounds for insecurity.

64.    Moreover, of the options provided by Section 10.1 for Adequate Assurance of Performance, Chesapeake selected the one method that would be the most unreasonable and difficult to secure within 48 hours over the course of the Memorial Day weekend—a $25 million irrevocable standby letter of credit.

65.    Chesapeake's demand for a $25 million irrevocable standby letter of credit as the sole means of Adequate Assurance of Performance is all the more egregious in light of (1) Chesapeake's failure to specify any reasonable grounds for insecurity; (2) Chesapeake's recent refusal to recognize Raider's relationship to the Contracts and to provide notice to Raider, the proper party with responsibility for the Contracts, despite receiving notification that Raider held and administered them, and then dealing with Raider for almost eight months; (3) Raider's and VOG's independent offers to provide abundant assurance; (4) Chesapeake's demand for a letter of credit in an amount and for a purpose far outside the economics of the Contracts; and (5) Chesapeake's advance notice of, and discussions with VOG about the VOG Transaction.[6]

---

[6] Chesapeake consistently hedged its refusal to recognize Plaintiff as a party to the Contracts by pointing to the last sentence of Section 14.1 of the Base Contract (while apparently ignoring the immediately preceding sentences of

66.     Chesapeake sought to use Sections 10.1 of the Base Contract to gain leverage and to create a pretext to terminate Transaction Confirmation #7 if Raider refused to renegotiate it.

67.     In so doing, Chesapeake breached Section 10.1 by demanding Adequate Assurance of Performance (1) without any reasonable grounds for insecurity and (2) through a form of security that was unreasonable under the circumstances.

68.     Section 12 of the Base Contract provides that it may only be terminated on "30 Day's written Notice, but shall remain in effect until the expiration of the latest Delivery Period of any transaction(s)."

69.     Chesapeake breached Section 12 of the Base Contract by purporting to terminate the Contracts without cause before "the expiration of the latest Delivery Period of [Transaction Confirmation #7]."

70.     Because Chesapeake's purported termination of the Contracts—premised on EXCO Operating's alleged failure to provide Adequate Assurance of Performance—was invalid and improper, Plaintiffs seek specific performance and other equitable relief requiring Chesapeake to perform its obligations under the Contracts consistent with Section 12 of the Base Contract.

71.     Furthermore, Section 14.1 of the Base Contract states that "No assignment of this Contract, in whole or in part, will be made without the prior written consent of the non-assigning party (and shall not relieve the assigning party from liability hereunder), which consent will not be unreasonably withheld or delayed[.]"

---

Section 14.1): "Upon any such assignment, transfer and assumption [to a parent or affiliate], the transferor shall remain principally liable for and shall not be relieved of or discharged from any obligations hereunder." Implicit in this language ("principally liable") is that the non-transferring party should first look to the transferee party—Raider.

PLAINTIFFS' ORIGINAL PETITION AND APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION                   Page 15

72.    Raider requested in writing Chesapeake's consent to assign the Contracts on April 13, 2017.  To date, Chesapeake has not responded to Raider's request for consent.  There are no grounds that could justify Chesapeake's refusal to consent.

73.    Additionally, Chesapeake seeks to use Section 14.1 to gain leverage, in combination with Section 10.1, over Raider in hopes of forcing Raider to renegotiate Transaction Confirmation #7 before assigning it or risk Chesapeake terminating it.  Chesapeake's conduct shows that any refusal to consent therefore would be for illegitimate purposes and would frustrate the essential purposes of the Contracts.

74.    Accordingly, Chesapeake has also breached Section 14.1 by unreasonably delaying and withholding consent to Plaintiffs' requests to assign the Contracts.

75.    Chesapeake has committed the foregoing breaches of contract in bad faith and in breach of the implied covenant of good faith and fair dealing.

76.    Raider has performed and remains willing and able to perform its obligations under the Contracts.

77.    Raider seeks its costs and attorney's fees pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code.

**B.    Declaratory Relief (By Raider Against Chesapeake)**

78.    Plaintiffs adopt and incorporate their allegations set forth above.

79.    Pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, Raider seeks a declaration that Chesapeake has and continues to abuse its rights under Section 14.1 of the Base Contract to provide written consent to any assignment or transfer of the Base Contract and associated transaction confirmations by unreasonably withholding and delaying its consent.

80.    Raider also seeks a declaration that, under Section 10.1 of the Base Contract, Chesapeake had no reasonable grounds for insecurity regarding Raider's performance of the

Contracts and, as a result, that no Event of Default occurred under Section 10.2 of the Base Contract.

81.     Raider also seeks a declaration that the Contracts remain in force and have not been terminated.

82.     Raider seeks recovery of its costs and reasonable and necessary attorney's fees pursuant to Section 37.009 of the Texas Civil Practice & Remedies Code.

**C.     Tortious Interference With Existing Contract (By EXCO Against Chesapeake)**

83.     Plaintiffs adopt and incorporate their allegations set forth above.

84.     EXCO Operating and EXCO Land, both subsidiaries of EXCO Resources, have a valid contract with VOG, which contemplates that Raider will sell and assign to VOG its interests under the Base Contract and Transaction Confirmation #7.

85.     Chesapeake knows about the VOG Transaction and contract between EXCO Operating, EXCO Land, and VOG because, among other things, Raider notified Chesapeake about the contract, and Chesapeake has discussed the contract with VOG.

86.     Chesapeake willfully and intentionally interfered with the contract between EXCO Operating, EXCO Land, and VOG, without justification or privilege, by breaching the Base Contract with knowledge that doing so necessarily would cause the breach, hindrance, or substantial impairment of the contract between EXCO Operating, EXCO Land, and VOG. Chesapeake intended that precise result so that it could have additional leverage to renegotiate its contractual obligations to Raider.

87.     Chesapeake's conduct has proximately caused EXCO injury.   Among other things, the value and expected benefits of EXCO Operating and EXCO Land's contract with VOG have been impaired by Chesapeake's breach of contract and instruction to Williams Midstream to close the receipt points for Raider's gas.  Chesapeake's performance under the

Base Contract and Transaction Confirmation #7 is an essential component of the contract between EXCO Operating, EXCO Land, and VOG.

### D. Tortious Interference With Prospective Business Relations (By EXCO Against Chesapeake)

88.     Plaintiffs adopt and incorporate their allegations set forth above.

89.     If the proposed transaction between EXCO Operating, EXCO Land (both subsidiaries of EXCO Resources), and VOG does not yet rise to the level of a recognized contract, EXCO pleads in the alternative that Chesapeake has tortiously interfered with EXCO's prospective business relationship with VOG.

90.     Raider intends to assign its interest in the Base Contract and Transaction Confirmation #7 to VOG.  EXCO Operating, EXCO Land, and VOG drafted and finalized documents to effectuate this transaction.  EXCO Operating, EXCO Land and VOG intended to close the transaction on June 1st, but did not do so because of Chesapeake's purported termination.  Although VOG extended the close date until June 15th, VOG will walk away from the VOG Transaction because if Chesapeake's purported termination is allowed to stand.  Accordingly, there was more than a reasonable probability—indeed, it was certain—that EXCO Operating, EXCO Land, and VOG would have entered a business relationship but for Chesapeake's conduct.

91.     Chesapeake intentionally interfered with the formation and consummation of EXCO Operating, EXCO Land, and VOG's business relationship.  Chesapeake knew about the pending relationship between EXCO Operating, EXCO Land, and VOG because, among other things, Raider notified Chesapeake about the VOG Transaction, and Chesapeake has discussed the Transaction with VOG.

92.     Chesapeake's conduct was independently unlawful.  Chesapeake breached the Base Contract with knowledge that doing so necessarily would prevent, hinder, frustrate, or substantially impair the consummation of EXCO Operating, EXCO Land, and VOG's business relationship.  Chesapeake intended that precise result so that it could have additional leverage to renegotiate its contractual obligations to Raider.

93.     Chesapeake's conduct has proximately caused EXCO injury.   Among other things, the value and expected benefits of EXCO's business relationship with VOG has been impaired by Chesapeake's breach of contract and instruction to Williams Midstream to close the receipt points for Raider's gas.  The Contracts are essential components of the proposed business relationship between EXCO and VOG.

## VII.    APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

94.     Plaintiffs adopt and incorporate their allegations set forth above.

95.     Unless immediately restrained, Chesapeake will continue to cause irreparable harm to Plaintiffs by depriving Raider of its valuable contractual rights and EXCO of its business expectations, for which there is no adequate remedy at law, including, without limitation: the right to sell gas to Chesapeake on the terms specified in Transaction Confirmation #7; the right to not be coerced by Chesapeake, under the threat of contract termination, to provide irrevocable standby letters of credit that negatively affect Raider's liquidity without Chesapeake articulating some reasonable grounds for financial insecurity; the virtual shut-down of a significant portion of EXCO's oil producing assets; and the loss or substantial impairment of the VOG Transaction.  Additionally, to the extent the Contracts could be construed to waive consequential damages for Chesapeake's unlawful conduct, Raider has no adequate remedy at law for the substantial

consequential damages intentionally inflicted upon it by Chesapeake's abuse and breach of contract.  Money damages cannot adequately compensate Plaintiffs.

96.     As a result, Plaintiffs seek a temporary restraining order and, after notice and a hearing, a temporary injunction preserving the status quo pending a trial on the merits.  A temporary restraining order and temporary injunction are necessary to preserve Plaintiffs' rights and prevent irreparable harm pending a trial on the merits and are warranted by Chesapeake's bad faith abuse of its contractual rights to hold Plaintiffs hostage unless and until Raider agrees to renegotiate a contract on Chesapeake's preferred terms.

97.     There is a substantial likelihood that Plaintiffs will prevail on the merits. Chesapeake has abused and breached its contractual rights to request adequate assurances of financial responsibility and to consent to assignments in order to deprive Plaintiffs of the benefits of Transaction Confirmation #7, the Base Contract, and the VOG Transaction.  At a minimum, it is clear that the Contracts have not been validly terminated and the status quo should be preserved prior to a trial on the merits.

98.     The threatened and irreparable harm to Plaintiffs outweighs any possible damage to Chesapeake by requiring it to perform according to the terms of Transaction Confirmation #7 and the Base Contract—under which Raider has performed and will continue to perform—to maintain the status quo while the Court has an opportunity to evaluate and rule on the merits of the parties' dispute.

99.     The public interest, including the rights of private parties to enter into and have their contractual agreements enforced and their business relationships undisturbed by unlawful interference, is served by an injunction.

100.    Therefore, Plaintiffs seek a temporary restraining order and temporary injunction restraining Chesapeake, its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them from violating the Base Contract and Transaction Confirmation #7, including without limitation, closing receipt points for Raider's gas or preventing receipt or delivery of Raider's gas, or refusing to pay for such gas.

101.    Plaintiffs are able and willing to post a reasonable bond.

## VIII.   CONDITIONS PRECEDENT

102.    All conditions precedent to Plaintiffs' claims for relief have been performed or have occurred, or were otherwise met, waived, or excused.

## IX.    RELIEF REQUESTED

103.    Plaintiffs respectfully requests that this Court:

    a.    issue a temporary restraining order enjoining Defendant from the conduct set forth above;

    b.    after a hearing, issue a temporary injunction enjoining Defendant as requested above pending a trial on the merits;

    c.    declare that the Contracts remain in force and that Defendant lacked reasonable basis to demand financial security or to withhold or delay consent;

    d.    order specific performance requiring Chesapeake to perform its obligations under the Contracts;

    e.    after a trial on the merits, award Plaintiffs actual, consequential, and exemplary damages;

    f.    award Plaintiffs their attorney fees, interest, and costs of suit; and

    g.    grant Plaintiffs all other relief, at law or equity, to which they may be entitled.

Date: June 6, 2017

Respectfully submitted,

 */s/ Greg Jackson*_____
T. Gregory Jackson
   Texas Bar No. 24004718
   greg.jackson@morganlewis.com
Winn Carter
   Texas Bar No. 03932950
   winn.carter@morganlewis.com
David Levy
   Texas Bar No. 12264850
   david.levy@morganlewis.com
Aaron Christian
   Texas Bar No. 24076089
   aaron.christian@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, Texas 75201
T.  214.466.4000
F.  214.466.4001

**COUNSEL FOR PLAINTIFFS**

### CERTIFICATION PER LOCAL RULE 1.08

To the best of my knowledge, this matter is not subject to transfer under Local Rule 1.06.

*Greg Jackson*_____
T. Gregory Jackson

### CERTIFICATION PER LOCAL RULE 2.02(a)

The undersigned will notify the opposing party and counsel, if represented by counsel in this case, and provide the party and any counsel with a copy of the Verified Original Petition and Application for Temporary Restraining Order and Temporary Injunction at least 2 hours before the same is to be presented to the Court for decision.

*Greg Jackson*_____
T. Gregory Jackson

**VERIFICATION**

STATE OF TEXAS            §
                         §
COUNTY OF DALLAS          §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Tyler Farquharson, who having been by me first duly sworn, upon his oath deposed and stated as follows:

My name is Tyler Farquharson. I am over 21 years of age and am fully competent to make this Verification. I am a Vice President and the Chief Financial Officer and Treasurer of EXCO Resources, Inc.; EXCO Operating Company, LP; EXCO Land Company, LLC; and Raider Marketing, LP. I have read each and every page of the foregoing Verified Original Petition, Application for Temporary Restraining Order, and Temporary Injunction. The factual statements contained therein are within my personal knowledge and are true and correct. Additionally, I have reviewed the exhibits attached thereto and declare that they are true and correct copies.

FURTHER AFFIANT SAYETH NOT.

_____
Tyler Farquharson

SUBSCRIBED AND SWORN to before me, the undersigned notary public, on this 5th day of June 2017.

_____
NOTARY PUBLIC
In and for the State of Texas

## Base Contract for Sale and Purchase of Natural Gas

This Base Contract is entered into as of the following date: **September 1, 2009.** The parties to this Base Contract are the following:

| | |
|---|---|
| Chesapeake Energy Marketing, Inc.                     **and** | EXCO Production Company, LP |
| P.O. Box 18496 Oklahoma City, OK 73154-0496 | 12377 Merit Dr Ste 1700, Dallas, TX 75251 |
| Duns Number: 80-984-9326 | Duns Number:          79-7003402 |
| Contract Number: | Contract Number: |
| U.S. Federal Tax ID Number: 73-1439175 | U.S. Federal Tax ID Number:    75-1891191 |
| *Notices*: | *Notices*: |
| P.O. Box 18496 Oklahoma City, OK 73154-0496 | Same as above |
| Attn:  Contract Administration | Attn:  Becky Lopez |
| Phone: 405.848.8000          Fax: 405.849.0034 | Phone:   214) 706-3348      Fax:   214) 438-1401 |
| *Confirmations*: | *Confirmations*: |
| P.O. Box 18496 Oklahoma City, OK 73154-0496 | 12377 Merit Dr Ste 1700, Dallas, TX 75251 |
| Attn: Contract Administration | Attn:  Becky Lopez |
| Phone: 405.848.8000          Fax:  405.849.0077 | Phone:   214) 706-3348      Fax:   214) 438-1401 |
| *Invoices and Payments*: | *Invoices and Payments*: |
| P.O. Box 96-0023 Oklahoma City, OK 73196-0023 | 12377 Merit Dr Ste 1700, Dallas, TX 75251 |
| Attn:  Accounting | Attn:  Becky Lopez |
| Phone: 405.848.8000          Fax: 405.849.2764 | Phone:   214) 706-3348      Fax:   214) 438-1401 |
| *Wire Transfer or ACH Numbers (if applicable)*: | *Wire Transfer or ACH Numbers (if applicable)*: |
| BANK: Bank of Oklahoma | BANK:   JP Morgan Chase |
| ABA: #103900036 | ABA:     021000021 |
| ACCT: #814107084 | ACCT:   725671317 |
| Other Details: | Other Details:  EXCO Production Company |

This Base Contract incorporates by reference for all purposes the General Terms and Conditions for Sale and Purchase of Natural Gas published by the North American Energy Standards Board.  The parties hereby agree to the following provisions offered in said General Terms and Conditions.  In the event the parties fail to check a box, the specified default provision shall apply.  <u>Select only one box from each section</u>:

| | | | | |
|---|---|---|---|---|
| **Section 1.2** Transaction Procedure | X ☐ | Oral (default) Written | **Section 7.2** Payment Date | ☐ _____ Day of Month following Month of delivery (default) <br> X   15th Day of Second Month following Month of delivery |
| **Section 2.5** Confirm Deadline | X ☐ | 2 Business Days after receipt (default) _____ Business Days after receipt | **Section 7.2** Method of Payment | X   Wire transfer (default) <br> ☐   Automated Clearinghouse Credit (ACH) <br> ☐   Check |
| **Section 2.6** Confirming Party | ☐ X ☐ | Seller (default) Buyer | **Section 7.7** Netting | X   Netting applies (default) <br> ☐   Netting does not apply |
| **Section 3.2** Performance Obligation | X ☐ | Cover Standard (default) Spot Price Standard | **Section 10.3.1** Early Termination Damages | X   Early Termination Damages Apply (default) <br> ☐   Early Termination Damages Do Not Apply |
| *Note: The following Spot Price Publication applies to both of the immediately preceding.* | | | **Section 10.3.2** Other Agreement Setoffs | X   Other Agreement Setoffs Apply (default) <br> ☐   Other Agreement Setoffs Do Not Apply |
| **Section 2.26** Spot Price Publication | X ☐ | Gas Daily Midpoint (default) | **Section 14.5** Choice Of Law | Oklahoma |
| **Section 6** Taxes | X ☐ | Buyer Pays At and After Delivery Point (default) <br> Seller Pays Before and At Delivery Point | **Section 14.10** Confidentiality | X   Confidentiality applies (default) <br> ☐   Confidentiality does not apply |
| ☐ Special Provisions Number of sheets attached: 0 <br> ☐ Addendum(s): None | | | | |

IN WITNESS WHEREOF, the parties hereto have executed this Base Contract in duplicate.

| | |
|---|---|
| **CHESAPEAKE ENERGY MARKETING, INC.** | **EXCO Production Company, LP** <br> By: Vaughan DE, LLC, it's general partner |
| By _____ | By _____ |
| Name:  *James C. Johnson* | Name: |
| Title:  *President* | Title: |

Copyright © 2002 North American Energy Standards Board, Inc. <br> All Rights Reserved   NAESB Standard 6.3.1 <br> April 19, 2002

EXHIBIT A

## General Terms and Conditions
## Base Contract for Sale and Purchase of Natural Gas

## SECTION 1.   PURPOSE AND PROCEDURES

1.1.   These General Terms and Conditions are intended to facilitate purchase and sale transactions of Gas on a Firm or Interruptible basis.   "Buyer" refers to the party receiving Gas and "Seller" refers to the party delivering Gas.   The entire agreement between the parties shall be the Contract as defined in Section 2.7.

The parties have selected either the "Oral Transaction Procedure" or the "Written Transaction Procedure" as indicated on the Base Contract.

**Oral Transaction Procedure:**

1.2.   The parties will use the following Transaction Confirmation procedure.   Any Gas purchase and sale transaction may be effectuated in an EDI transmission or telephone conversation with the offer and acceptance constituting the agreement of the parties. The parties shall be legally bound from the time they so agree to transaction terms and may each rely thereon.   Any such transaction shall be considered a "writing" and to have been "signed".   Notwithstanding the foregoing sentence, the parties agree that Confirming Party shall, and the other party may, confirm a telephonic transaction by sending the other party a Transaction Confirmation by facsimile, EDI or mutually agreeable electronic means within three Business Days of a transaction covered by this Section 1.2 (Oral Transaction Procedure) provided that the failure to send a Transaction Confirmation shall not invalidate the oral agreement of the parties.   Confirming Party adopts its confirming letterhead, or the like, as its signature on any Transaction Confirmation as the identification and authentication of Confirming Party.   If the Transaction Confirmation contains any provisions other than those relating to the commercial terms of the transaction (i.e., price, quantity, performance obligation, delivery point, period of delivery and/or transportation conditions), which modify or supplement the Base Contract or General Terms and Conditions of this Contract (e.g., arbitration or additional representations and warranties), such provisions shall not be deemed to be accepted pursuant to Section 1.3 but must be expressly agreed to by both parties; provided that the foregoing shall not invalidate any transaction agreed to by the parties.

**Written Transaction Procedure:**

1.2.   The parties will use the following Transaction Confirmation procedure.   Should the parties come to an agreement regarding a Gas purchase and sale transaction for a particular Delivery Period, the Confirming Party shall, and the other party may, record that agreement on a Transaction Confirmation and communicate such Transaction Confirmation by facsimile, EDI or mutually agreeable electronic means, to the other party by the close of the Business Day following the date of agreement.   The parties acknowledge that their agreement will not be binding until the exchange of nonconflicting Transaction Confirmations or the passage of the Confirm Deadline without objection from the receiving party, as provided in Section 1.3.

1.3.   If a sending party's Transaction Confirmation is materially different from the receiving party's understanding of the agreement referred to in Section 1.2, such receiving party shall notify the sending party via facsimile, EDI or mutually agreeable electronic means by the Confirm Deadline, unless such receiving party has previously sent a Transaction Confirmation to the sending party.   The failure of the receiving party to so notify the sending party in writing by the Confirm Deadline constitutes the receiving party's agreement to the terms of the transaction described in the sending party's Transaction Confirmation.   If there are any material differences between timely sent Transaction Confirmations governing the same transaction, then neither Transaction Confirmation shall be binding until or unless such differences are resolved including the use of any evidence that clearly resolves the differences in the Transaction Confirmations.   In the event of a conflict among the terms of (i) a binding Transaction Confirmation pursuant to Section 1.2, (ii) the oral agreement of the parties which may be evidenced by a recorded conversation, where the parties have selected the Oral Transaction Procedure of the Base Contract, (iii) the Base Contract, and (iv) these General Terms and Conditions, the terms of the documents shall govern in the priority listed in this sentence.

1.4.   The parties agree that each party may electronically record all telephone conversations with respect to this Contract between their respective employees, without any special or further notice to the other party.   Each party shall obtain any necessary consent of its agents and employees to such recording.   Where the parties have selected the Oral Transaction Procedure in Section 1.2 of the Base Contract, the parties agree not to contest the validity or enforceability of telephonic recordings entered into in accordance with the requirements of this Base Contract.   However, nothing herein shall be construed as a waiver of any objection to the admissibility of such evidence.

## SECTION 2.   DEFINITIONS

The terms set forth below shall have the meaning ascribed to them below.   Other terms are also defined elsewhere in the Contract and shall have the meanings ascribed to them herein.

2.1.   "Alternative Damages" shall mean such damages, expressed in dollars or dollars per MMBtu, as the parties shall agree upon in the Transaction Confirmation, in the event either Seller or Buyer fails to perform a Firm obligation to deliver Gas in the case of Seller or to receive Gas in the case of Buyer.

2.2.   "Base Contract" shall mean a contract executed by the parties that incorporates these General Terms and Conditions by reference; that specifies the agreed selections of provisions contained herein; and that sets forth other information required herein and any Special Provisions and addendum(s) as identified on the cover page.

2.3.   "British thermal unit" or "Btu" shall mean the international BTU, which is also called the Btu (IT).

EXHIBIT A

2.4.     "Business Day" shall mean any day except Saturday, Sunday or Federal Reserve Bank holidays.

2.5.     "Confirm Deadline" shall mean 5:00 p.m. in the receiving party's time zone on the second Business Day following the Day a Transaction Confirmation is received or, if applicable, on the Business Day agreed to by the parties in the Base Contract; provided, if the Transaction Confirmation is time stamped after 5:00 p.m. in the receiving party's time zone, it shall be deemed received at the opening of the next Business Day.

2.6.     "Confirming Party" shall mean the party designated in the Base Contract to prepare and forward Transaction Confirmations to the other party.

2.7.     "Contract" shall mean the legally-binding relationship established by (i) the Base Contract, (ii) any and all binding Transaction Confirmations and (iii) where the parties have selected the Oral Transaction Procedure in Section 1.2 of the Base Contract, any and all transactions that the parties have entered into through an EDI transmission or by telephone, but that have not been confirmed in a binding Transaction Confirmation.

2.8.     "Contract Price" shall mean the amount expressed in U.S. Dollars per MMBtu to be paid by Buyer to Seller for the purchase of Gas as agreed to by the parties in a transaction.

2.9.     "Contract Quantity" shall mean the quantity of Gas to be delivered and taken as agreed to by the parties in a transaction.

2.10.    "Cover Standard", as referred to in Section 3.2, shall mean that if there is an unexcused failure to take or deliver any quantity of Gas pursuant to this Contract, then the performing party shall use commercially reasonable efforts to (i) if Buyer is the performing party, obtain Gas, (or an alternate fuel if elected by Buyer and replacement Gas is not available), or (ii) if Seller is the performing party, sell Gas, in either case, at a price reasonable for the delivery or production area, as applicable, consistent with:  the amount of notice provided by the nonperforming party; the immediacy of the Buyer's Gas consumption needs or Seller's Gas sales requirements, as applicable; the quantities involved; and the anticipated length of failure by the nonperforming party.

2.11.    "Credit Support Obligation(s)" shall mean any obligation(s) to provide or establish credit support for, or on behalf of, a party to this Contract such as an irrevocable standby letter of credit, a margin agreement, a prepayment, a security interest in an asset, a performance bond, guaranty, or other good and sufficient security of a continuing nature.

2.12.    "Day" shall mean a period of 24 consecutive hours, coextensive with a "day" as defined by the Receiving Transporter in a particular transaction.

2.13.    "Delivery Period" shall be the period during which deliveries are to be made as agreed to by the parties in a transaction.

2.14.    "Delivery Point(s)" shall mean such point(s) as are agreed to by the parties in a transaction.

2.15.    "EDI" shall mean an electronic data interchange pursuant to an agreement entered into by the parties, specifically relating to the communication of Transaction Confirmations under this Contract.

2.16.    "EFP" shall mean the purchase, sale or exchange of natural Gas as the "physical" side of an exchange for physical transaction involving gas futures contracts.  EFP shall incorporate the meaning and remedies of "Firm", provided that a party's excuse for nonperformance of its obligations to deliver or receive Gas will be governed by the rules of the relevant futures exchange regulated under the Commodity Exchange Act.

2.17.    "Firm" shall mean that either party may interrupt its performance without liability only to the extent that such performance is prevented for reasons of Force Majeure; provided, however, that during Force Majeure interruptions, the party invoking Force Majeure may be responsible for any Imbalance Charges as set forth in Section 4.3 related to its interruption after the nomination is made to the Transporter and until the change in deliveries and/or receipts is confirmed by the Transporter.

2.18.    "Gas" shall mean any mixture of hydrocarbons and noncombustible gases in a gaseous state consisting primarily of methane.

2.19.    "Imbalance Charges" shall mean any fees, penalties, costs or charges (in cash or in kind) assessed by a Transporter for failure to satisfy the Transporter's balance and/or nomination requirements.

2.20.    "Interruptible" shall mean that either party may interrupt its performance at any time for any reason, whether or not caused by an event of Force Majeure, with no liability, except such interrupting party may be responsible for any Imbalance Charges as set forth in Section 4.3 related to its interruption after the nomination is made to the Transporter and until the change in deliveries and/or receipts is confirmed by Transporter.

2.21.    "MMBtu" shall mean one million British thermal units, which is equivalent to one dekatherm.

2.22.    "Month" shall mean the period beginning on the first Day of the calendar month and ending immediately prior to the commencement of the first Day of the next calendar month.

2.23.    "Payment Date" shall mean a date, as indicated on the Base Contract, on or before which payment is due Seller for Gas received by Buyer in the previous Month.

2.24.    "Receiving Transporter" shall mean the Transporter receiving Gas at a Delivery Point, or absent such receiving Transporter, the Transporter delivering Gas at a Delivery Point.

2.25.    "Scheduled Gas" shall mean the quantity of Gas confirmed by Transporter(s) for movement, transportation or management.

2.26.    "Spot Price " as referred to in Section 3.2 shall mean the price listed in the publication indicated on the Base Contract, under the listing applicable to the geographic location closest in proximity to the Delivery Point(s) for the relevant Day; provided, if there is no single price published for such location for such Day, but there is published a range of prices, then the Spot Price shall be the average

EXHIBIT A

DOCUMENT PAGE # 26

of such high and low prices. If no price or range of prices is published for such Day, then the Spot Price shall be the average of the following: (i) the price (determined as stated above) for the first Day for which a price or range of prices is published that next precedes the relevant Day; and (ii) the price (determined as stated above) for the first Day for which a price or range of prices is published that next follows the relevant Day.

2.27.   "Transaction Confirmation" shall mean a document, similar to the form of Exhibit A, setting forth the terms of a transaction formed pursuant to Section 1 for a particular Delivery Period.

2.28.   "Termination Option" shall mean the option of either party to terminate a transaction in the event that the other party fails to perform a Firm obligation to deliver Gas in the case of Seller or to receive Gas in the case of Buyer for a designated number of days during a period as specified on the applicable Transaction Confirmation.

2.29.   "Transporter(s)" shall mean all Gas gathering or pipeline companies, or local distribution companies, acting in the capacity of a transporter, transporting Gas for Seller or Buyer upstream or downstream, respectively, of the Delivery Point pursuant to a particular transaction.

# SECTION 3.   PERFORMANCE OBLIGATION

3.1.   Seller agrees to sell and deliver, and Buyer agrees to receive and purchase, the Contract Quantity for a particular transaction in accordance with the terms of the Contract. Sales and purchases will be on a Firm or Interruptible basis, as agreed to by the parties in a transaction.

| The parties have selected either the "Cover Standard" or the "Spot Price Standard" as indicated on the Base Contract. |
|---|
| **Cover Standard:** |
| 3.2.   The sole and exclusive remedy of the parties in the event of a breach of a Firm obligation to deliver or receive Gas shall be recovery of the following: (i) in the event of a breach by Seller on any Day(s), payment by Seller to Buyer in an amount equal to the positive difference, if any, between the purchase price paid by Buyer utilizing the Cover Standard and the Contract Price, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s), multiplied by the difference between the Contract Quantity and the quantity actually delivered by Seller for such Day(s); or (ii) in the event of a breach by Buyer on any Day(s), payment by Buyer to Seller in the amount equal to the positive difference, if any, between the Contract Price and the price received by Seller utilizing the Cover Standard for the resale of such Gas, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s), multiplied by the difference between the Contract Quantity and the quantity actually taken by Buyer for such Day(s); or (iii) in the event that Buyer has used commercially reasonable efforts to replace the Gas or Seller has used commercially reasonable efforts to sell the Gas to a third party, and no such replacement or sale is available, then the sole and exclusive remedy of the performing party shall be any unfavorable difference between the Contract Price and the Spot Price, adjusted for such transportation to the applicable Delivery Point, multiplied by the difference between the Contract Quantity and the quantity actually delivered by Seller and received by Buyer for such Day(s). Imbalance Charges shall not be recovered under this Section 3.2, but Seller and/or Buyer shall be responsible for Imbalance Charges, if any, as provided in Section 4.3. The amount of such unfavorable difference shall be payable five Business Days after presentation of the performing party's invoice, which shall set forth the basis upon which such amount was calculated. |
| **Spot Price Standard:** |
| 3.2.   The sole and exclusive remedy of the parties in the event of a breach of a Firm obligation to deliver or receive Gas shall be recovery of the following: (i) in the event of a breach by Seller on any Day(s), payment by Seller to Buyer in an amount equal to the difference between the Contract Quantity and the actual quantity delivered by Seller and received by Buyer for such Day(s), multiplied by the positive difference, if any, obtained by subtracting the Contract Price from the Spot Price; or (ii) in the event of a breach by Buyer on any Day(s), payment by Buyer to Seller in an amount equal to the difference between the Contract Quantity and the actual quantity delivered by Seller and received by Buyer for such Day(s), multiplied by the positive difference, if any, obtained by subtracting the applicable Spot Price from the Contract Price. Imbalance Charges shall not be recovered under this Section 3.2, but Seller and/or Buyer shall be responsible for Imbalance Charges, if any, as provided in Section 4.3. The amount of such unfavorable difference shall be payable five Business Days after presentation of the performing party's invoice, which shall set forth the basis upon which such amount was calculated. |

3.3.   Notwithstanding Section 3.2, the parties may agree to Alternative Damages in a Transaction Confirmation executed in writing by both parties.

3.4.   In addition to Sections 3.2 and 3.3, the parties may provide for a Termination Option in a Transaction Confirmation executed in writing by both parties. The Transaction Confirmation containing the Termination Option will designate the length of nonperformance triggering the Termination Option and the procedures for exercise thereof, how damages for nonperformance will be compensated, and how liquidation costs will be calculated.

# SECTION 4.   TRANSPORTATION, NOMINATIONS, AND IMBALANCES

4.1.   Seller shall have the sole responsibility for transporting the Gas to the Delivery Point(s). Buyer shall have the sole responsibility for transporting the Gas from the Delivery Point(s).

4.2.   The parties shall coordinate their nomination activities, giving sufficient time to meet the deadlines of the affected Transporter(s). Each party shall give the other party timely prior Notice, sufficient to meet the requirements of all Transporter(s) involved in the transaction, of the quantities of Gas to be delivered and purchased each Day. Should either party become aware that actual deliveries at the Delivery Point(s) are greater or lesser than the Scheduled Gas, such party shall promptly notify the other party.

EXHIBIT A

DOCUMENT PAGE # 27

4.3.     The parties shall use commercially reasonable efforts to avoid imposition of any Imbalance Charges.  If Buyer or Seller receives an Invoice from a Transporter that includes Imbalance Charges, the parties shall determine the validity as well as the cause of such Imbalance Charges.  If the Imbalance Charges were incurred as a result of Buyer's receipt of quantities of Gas greater than or less than the Scheduled Gas, then Buyer shall pay for such Imbalance Charges or reimburse Seller for such Imbalance Charges paid by Seller.  If the Imbalance Charges were incurred as a result of Seller's delivery of quantities of Gas greater than or less than the Scheduled Gas, then Seller shall pay for such Imbalance Charges or reimburse Buyer for such Imbalance Charges paid by Buyer.

## SECTION 5.     QUALITY AND MEASUREMENT

All Gas delivered by Seller shall meet the pressure, quality and heat content requirements of the Receiving Transporter.  The unit of quantity measurement for purposes of this Contract shall be one MMBtu dry.  Measurement of Gas quantities hereunder shall be in accordance with the established procedures of the Receiving Transporter.

## SECTION 6.     TAXES

The parties have selected either "Buyer Pays At and After Delivery Point" or "Seller Pays Before and At Delivery Point" as indicated on the Base Contract.

**Buyer Pays At and After Delivery Point:**

Seller shall pay or cause to be paid all taxes, fees, levies, penalties, licenses or charges imposed by any government authority ("Taxes") on or with respect to the Gas prior to the Delivery Point(s).  Buyer shall pay or cause to be paid all Taxes on or with respect to the Gas at the Delivery Point(s) and all Taxes after the Delivery Point(s).  If a party is required to remit or pay Taxes that are the other party's responsibility hereunder, the party responsible for such Taxes shall promptly reimburse the other party for such Taxes.  Any party entitled to an exemption from any such Taxes or charges shall furnish the other party any necessary documentation thereof.

**Seller Pays Before and At Delivery Point:**

Seller shall pay or cause to be paid all taxes, fees, levies, penalties, licenses or charges imposed by any government authority ("Taxes") on or with respect to the Gas prior to the Delivery Point(s) and all Taxes at the Delivery Point(s).  Buyer shall pay or cause to be paid all Taxes on or with respect to the Gas after the Delivery Point(s).  If a party is required to remit or pay Taxes that are the other party's responsibility hereunder, the party responsible for such Taxes shall promptly reimburse the other party for such Taxes.  Any party entitled to an exemption from any such Taxes or charges shall furnish the other party any necessary documentation thereof.

## SECTION 7.     BILLING, PAYMENT, AND AUDIT

7.1.     Seller shall Invoice Buyer for Gas delivered and received in the preceding Month and for any other applicable charges, providing supporting documentation acceptable in industry practice to support the amount charged.  If the actual quantity delivered is not known by the billing date, billing will be prepared based on the quantity of Scheduled Gas.  The Invoiced quantity will then be adjusted to the actual quantity on the following Month's billing or as soon thereafter as actual delivery information is available.

7.2.     Buyer shall remit the amount due under Section 7.1 in the manner specified in the Base Contract, in immediately available funds, on or before the later of the Payment Date or 10 Days after receipt of the Invoice by Buyer; provided that if the Payment Date is not a Business Day, payment is due on the next Business Day following that date.  In the event any payments are due Buyer hereunder, payment to Buyer shall be made in accordance with this Section 7.2.

7.3.     In the event payments become due pursuant to Sections 3.2 or 3.3, the performing party may submit an Invoice to the nonperforming party for an accelerated payment setting forth the basis upon which the invoiced amount was calculated.  Payment from the nonperforming party will be due five Business Days after receipt of Invoice.

7.4.     If the invoiced party, in good faith, disputes the amount of any such Invoice or any part thereof, such invoiced party will pay such amount as it concedes to be correct; provided, however, if the invoiced party disputes the amount due, it must provide supporting documentation acceptable in industry practice to support the amount paid or disputed.  In the event the parties are unable to resolve such dispute, either party may pursue any remedy available at law or in equity to enforce its rights pursuant to this Section.

7.5.     If the invoiced party fails to remit the full amount payable when due, interest on the unpaid portion shall accrue from the date due until the date of payment at a rate equal to the lower of (i) the then-effective prime rate of interest published under "Money Rates" by The Wall Street Journal, plus two percent per annum; or (ii) the maximum applicable lawful interest rate.

7.6.     A party shall have the right, at its own expense, upon reasonable Notice and at reasonable times, to examine and audit and to obtain copies of the relevant portion of the books, records, and telephone recordings of the other party only to the extent reasonably necessary to verify the accuracy of any statement, charge, payment, or computation made under the Contract.  This right to examine, audit, and to obtain copies shall not be available with respect to proprietary information not directly relevant to transactions under this Contract.  All Invoices and billings shall be conclusively presumed final and accurate and all associated claims for under- or overpayments shall be deemed waived unless such Invoices or billings are objected to in writing, with adequate explanation and/or documentation, within two years after the Month of Gas delivery.  All retroactive adjustments under Section 7 shall be paid in full by the party owing payment within 30 Days of Notice and substantiation of such inaccuracy.

7.7.     Unless the parties have elected on the Base Contract not to make this Section 7.7 applicable to this Contract, the parties shall net all undisputed amounts due and owing, and/or past due, arising under the Contract such that the party owing the greater amount shall make a single payment of the net amount to the other party in accordance with Section 7; provided that no payment required to be made pursuant to the terms of any Credit Support Obligation or pursuant to Section 7.3 shall be subject to netting under this Section.  If the parties have executed a separate netting agreement, the terms and conditions therein shall prevail to the extent inconsistent herewith.

EXHIBIT A

DOCUMENT PAGE # 28

# SECTION 8.    TITLE, WARRANTY, AND INDEMNITY

8.1.    Unless otherwise specifically agreed, title to the Gas shall pass from Seller to Buyer at the Delivery Point(s). Seller shall have responsibility for and assume any liability with respect to the Gas prior to its delivery to Buyer at the specified Delivery Point(s). Buyer shall have responsibility for and any liability with respect to said Gas after its delivery to Buyer at the Delivery Point(s).

8.2.    Seller warrants that it will have the right to convey and will transfer good and merchantable title to all Gas sold hereunder and delivered by it to Buyer, free and clear of all liens, encumbrances, and claims. EXCEPT AS PROVIDED IN THIS SECTION 8.2 AND IN SECTION 14.8, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR ANY PARTICULAR PURPOSE, ARE DISCLAIMED.

8.3.    Seller agrees to indemnify Buyer and save it harmless from all losses, liabilities or claims including reasonable attorneys' fees and costs of court ("Claims"), from any and all persons, arising from or out of claims of title, personal injury or property damage from said Gas or other charges thereon which attach before title passes to Buyer. Buyer agrees to indemnify Seller and save it harmless from all Claims, from any and all persons, arising from or out of claims regarding payment, personal injury or property damage from said Gas or other charges thereon which attach after title passes to Buyer.

8.4.    Notwithstanding the other provisions of this Section 8, as between Seller and Buyer, Seller will be liable for all Claims to the extent that such arise from the failure of Gas delivered by Seller to meet the quality requirements of Section 5.

# SECTION 9.    NOTICES

9.1.    All Transaction Confirmations, invoices, payments and other communications made pursuant to the Base Contract ("Notices") shall be made to the addresses specified in writing by the respective parties from time to time.

9.2.    All Notices required hereunder may be sent by facsimile or mutually acceptable electronic means, a nationally recognized overnight courier service, first class mail or hand delivered.

9.3.    Notice shall be given when received on a Business Day by the addressee. In the absence of proof of the actual receipt date, the following presumptions will apply. Notices sent by facsimile shall be deemed to have been received upon the sending party's receipt of its facsimile machine's confirmation of successful transmission. If the day on which such facsimile is received is not a Business Day or is after five p.m. on a Business Day, then such facsimile shall be deemed to have been received on the next following Business Day. Notice by overnight mail or courier shall be deemed to have been received on the next Business Day after it was sent or such earlier time as is confirmed by the receiving party. Notice via first class mail shall be considered delivered five Business Days after mailing.

# SECTION 10.    FINANCIAL RESPONSIBILITY

10.1.    If either party ("X") has reasonable grounds for insecurity regarding the performance of any obligation under this Contract (whether or not then due) by the other party ("Y") (including, without limitation, the occurrence of a material change in the creditworthiness of Y), X may demand Adequate Assurance of Performance. "Adequate Assurance of Performance" shall mean sufficient security in the form, amount and for the term reasonably acceptable to X, including, but not limited to, a standby irrevocable letter of credit, a prepayment, a security interest in an asset or a performance bond or guaranty (including the issuer of any such security).

10.2.    In the event (each an "Event of Default") either party (the "Defaulting Party") or its guarantor shall: (i) make an assignment or any general arrangement for the benefit of creditors; (ii) file a petition or otherwise commence, authorize, or acquiesce in the commencement of a proceeding or case under any bankruptcy or similar law for the protection of creditors or have such petition filed or proceeding commenced against it; (iii) otherwise become bankrupt or insolvent (however evidenced); (iv) be unable to pay its debts as they fall due; (v) have a receiver, provisional liquidator, conservator, custodian, trustee or other similar official appointed with respect to it or substantially all of its assets; (vi) fail to perform any obligation to the other party with respect to any Credit Support Obligations relating to the Contract; (vii) fail to give Adequate Assurance of Performance under Section 10.1 within 48 hours but at least one Business Day of a written request by the other party; or (viii) not have paid any amount due the other party hereunder on or before the second Business Day following written Notice that such payment is due; then the other party (the "Non-Defaulting Party") shall have the right, at its sole election, to immediately withhold and/or suspend deliveries or payments upon Notice and/or to terminate and liquidate the transactions under the Contract, in the manner provided in Section 10.3, in addition to any and all other remedies available hereunder.

10.3.    If an Event of Default has occurred and is continuing, the Non-Defaulting Party shall have the right, by Notice to the Defaulting Party, to designate a Day, no earlier than the Day such Notice is given and no later than 20 Days after such Notice is given, as an early termination date (the "Early Termination Date") for the liquidation and termination pursuant to Section 10.3.1 of all transactions under the Contract, each a "Terminated Transaction." On the Early Termination Date, all transactions will terminate, other than those transactions, if any, that may not be liquidated and terminated under applicable law or that are, in the reasonable opinion of the Non-Defaulting Party, commercially impracticable to liquidate and terminate ("Excluded Transactions"), which Excluded Transactions must be liquidated and terminated as soon thereafter as is reasonably practicable, and upon termination shall be a Terminated Transaction and be valued consistent with Section 10.3.1 below. With respect to each Excluded Transaction, its actual termination date shall be the Early Termination Date for purposes of Section 10.3.1.

EXHIBIT A

The parties have selected either "Early Termination Damages Apply" or "Early Termination Damages Do Not Apply" as indicated on the Base Contract.

**Early Termination Damages Apply:**

10.3.1.   As of the Early Termination Date, the Non-Defaulting Party shall determine, in good faith and in a commercially reasonable manner, (i) the amount owed (whether or not then due) by each party with respect to all Gas delivered and received between the parties under Terminated Transactions and Excluded Transactions on and before the Early Termination Date and all other applicable charges relating to such deliveries and receipts (including without limitation any amounts owed under Section 3.2), for which payment has not yet been made by the party that owes such payment under this Contract and (ii) the Market Value, as defined below, of each Terminated Transaction.   The Non-Defaulting Party shall (x) liquidate and accelerate each Terminated Transaction at its Market Value, so that each amount equal to the difference between such Market Value and the Contract Value, as defined below, of such Terminated Transaction(s) shall be due to the Buyer under the Terminated Transaction(s) if such Market Value exceeds the Contract Value and to the Seller if the opposite is the case; and (y) where appropriate, discount each amount then due under clause (x) above to present value in a commercially reasonable manner as of the Early Termination Date (to take account of the period between the date of liquidation and the date on which such amount would have otherwise been due pursuant to the relevant Terminated Transactions).

For purposes of this Section 10.3.1, "Contract Value" means the amount of Gas remaining to be delivered or purchased under a transaction multiplied by the Contract Price, and "Market Value" means the amount of Gas remaining to be delivered or purchased under a transaction multiplied by the market price for a similar transaction at the Delivery Point determined by the Non-Defaulting Party in a commercially reasonable manner.   To ascertain the Market Value, the Non-Defaulting Party may consider, among other valuations, any or all of the settlement prices of NYMEX Gas futures contracts, quotations from leading dealers in energy swap contracts or physical gas trading markets, similar sales or purchases and any other bona fide third-party offers, all adjusted for the length of the term and differences in transportation costs.   A party shall not be required to enter into a replacement transaction(s) in order to determine the Market Value.   Any extension(s) of the term of a transaction to which parties are not bound as of the Early Termination Date (including but not limited to "evergreen provisions") shall not be considered in determining Contract Values and Market Values.   For the avoidance of doubt, any option pursuant to which one party has the right to extend the term of a transaction shall be considered in determining Contract Values and Market Values.   The rate of interest used in calculating net present value shall be determined by the Non-Defaulting Party in a commercially reasonable manner.

**Early Termination Damages Do Not Apply:**

10.3.1.   As of the Early Termination Date, the Non-Defaulting Party shall determine, in good faith and in a commercially reasonable manner, the amount owed (whether or not then due) by each party with respect to all Gas delivered and received between the parties under Terminated Transactions and Excluded Transactions on and before the Early Termination Date and all other applicable charges relating to such deliveries and receipts (including without limitation any amounts owed under Section 3.2), for which payment has not yet been made by the party that owes such payment under this Contract.

The parties have selected either "Other Agreement Setoffs Apply" or "Other Agreement Setoffs Do Not Apply" as indicated on the Base Contract.

**Other Agreement Setoffs Apply:**

10.3.2.   The Non-Defaulting Party shall net or aggregate, as appropriate, any and all amounts owing between the parties under Section 10.3.1, so that all such amounts are netted or aggregated to a single liquidated amount payable by one party to the other (the "Net Settlement Amount").   At its sole option and without prior Notice to the Defaulting Party, the Non-Defaulting Party may setoff (i) any Net Settlement Amount owed to the Non-Defaulting Party against any margin or other collateral held by it in connection with any Credit Support Obligation relating to the Contract; or (ii) any Net Settlement Amount payable to the Defaulting Party against any amount(s) payable by the Defaulting Party to the Non-Defaulting Party under any other agreement or arrangement between the parties.

**Other Agreement Setoffs Do Not Apply:**

10.3.2.   The Non-Defaulting Party shall net or aggregate, as appropriate, any and all amounts owing between the parties under Section 10.3.1, so that all such amounts are netted or aggregated to a single liquidated amount payable by one party to the other (the "Net Settlement Amount").   At its sole option and without prior Notice to the Defaulting Party, the Non-Defaulting Party may setoff any Net Settlement Amount owed to the Non-Defaulting Party against any margin or other collateral held by it in connection with any Credit Support Obligation relating to the Contract.

10.3.3.   If any obligation that is to be included in any netting, aggregation or setoff pursuant to Section 10.3.2 is unascertained, the Non-Defaulting Party may in good faith estimate that obligation and net, aggregate or setoff, as applicable, in respect of the estimate, subject to the Non-Defaulting Party accounting to the Defaulting Party when the obligation is ascertained.   Any amount not then due which is included in any netting, aggregation or setoff pursuant to Section 10.3.2 shall be discounted to net present value in a commercially reasonable manner determined by the Non-Defaulting Party.

10.4.   As soon as practicable after a liquidation, Notice shall be given by the Non-Defaulting Party to the Defaulting Party of the Net Settlement Amount, and whether the Net Settlement Amount is due to or due from the Non-Defaulting Party.   The Notice shall include a written statement explaining in reasonable detail the calculation of such amount, provided that failure to give such Notice shall not affect the validity or enforceability of the liquidation or give rise to any claim by the Defaulting Party against the Non-Defaulting Party.   The Net Settlement Amount shall be paid by the close of business on the second Business Day following such Notice, which date shall not be earlier than the Early Termination Date.   Interest on any unpaid portion of the Net Settlement Amount shall accrue from the date due until the

EXHIBIT A

date of payment at a rate equal to the lower of (i) the then-effective prime rate of interest published under "Money Rates" by The Wall Street Journal, plus two percent per annum; or (ii) the maximum applicable lawful interest rate.

10.5.    The parties agree that the transactions hereunder constitute a "forward contract" within the meaning of the United States Bankruptcy Code and that Buyer and Seller are each "forward contract merchants" within the meaning of the United States Bankruptcy Code.

10.6.    The Non-Defaulting Party's remedies under this Section 10 are the sole and exclusive remedies of the Non-Defaulting Party with respect to the occurrence of any Early Termination Date. Each party reserves to itself all other rights, setoffs, counterclaims and other defenses that it is or may be entitled to arising from the Contract.

10.7.    With respect to this Section 10, if the parties have executed a separate netting agreement with close-out netting provisions, the terms and conditions therein shall prevail to the extent inconsistent herewith.

## SECTION 11.    FORCE MAJEURE

11.1.    Except with regard to a party's obligation to make payment(s) due under Section 7, Section 10.4, and Imbalance Charges under Section 4, neither party shall be liable to the other for failure to perform a Firm obligation, to the extent such failure was caused by Force Majeure. The term "Force Majeure" as employed herein means any cause not reasonably within the control of the party claiming suspension, as further defined in Section 11.2.

11.2.    Force Majeure shall include, but not be limited to, the following: (i) physical events such as acts of God, landslides, lightning, earthquakes, fires, storms or storm warnings, such as hurricanes, which result in evacuation of the affected area, floods, washouts, explosions, breakage or accident or necessity of repairs to machinery or equipment or lines of pipe; (ii) weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe; (iii) interruption and/or curtailment of Firm transportation and/or storage by Transporters; (iv) acts of others such as strikes, lockouts or other industrial disturbances, riots, sabotage, insurrections or wars; and (v) governmental actions such as necessity for compliance with any court order, law, statute, ordinance, regulation, or policy having the effect of law promulgated by a governmental authority having jurisdiction. Seller and Buyer shall make reasonable efforts to avoid the adverse impacts of a Force Majeure and to resolve the event or occurrence once it has occurred in order to resume performance.

11.3.    Neither party shall be entitled to the benefit of the provisions of Force Majeure to the extent performance is affected by any or all of the following circumstances: (i) the curtailment of interruptible or secondary Firm transportation unless primary, in-path, Firm transportation is also curtailed; (ii) the party claiming excuse failed to remedy the condition and to resume the performance of such covenants or obligations with reasonable dispatch; or (iii) economic hardship, to include, without limitation, Seller's ability to sell Gas at a higher or more advantageous price than the Contract Price, Buyer's ability to purchase Gas at a lower or more advantageous price than the Contract Price, or a regulatory agency disallowing, in whole or in part, the pass through of costs resulting from this Agreement; (iv) the loss of Buyer's market(s) or Buyer's inability to use or resell Gas purchased hereunder, except, in either case, as provided in Section 11.2; or (v) the loss or failure of Seller's gas supply or depletion of reserves, except, in either case, as provided in Section 11.2. The party claiming Force Majeure shall not be excused from its responsibility for Imbalance Charges.

11.4.    Notwithstanding anything to the contrary herein, the parties agree that the settlement of strikes, lockouts or other industrial disturbances shall be within the sole discretion of the party experiencing such disturbance.

11.5.    The party whose performance is prevented by Force Majeure must provide Notice to the other party. Initial Notice may be given orally; however, written Notice with reasonably full particulars of the event or occurrence is required as soon as reasonably possible. Upon providing written Notice of Force Majeure to the other party, the affected party will be relieved of its obligation, from the onset of the Force Majeure event, to make or accept delivery of Gas, as applicable, to the extent and for the duration of Force Majeure, and neither party shall be deemed to have failed in such obligations to the other during such occurrence or event.

11.6.    Notwithstanding Sections 11.2 and 11.3, the parties may agree to alternative Force Majeure provisions in a Transaction Confirmation executed in writing by both parties.

## SECTION 12.    TERM

This Contract may be terminated on 30 Day's written Notice, but shall remain in effect until the expiration of the latest Delivery Period of any transaction(s). The rights of either party pursuant to Section 7.6 and Section 10, the obligations to make payment hereunder, and the obligation of either party to indemnify the other, pursuant hereto shall survive the termination of the Base Contract or any transaction.

## SECTION 13.    LIMITATIONS

FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY. A PARTY'S LIABILITY HEREUNDER SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN OR IN A TRANSACTION, A PARTY'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY. SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. UNLESS EXPRESSLY HEREIN PROVIDED, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE. IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE.

EXHIBIT A

TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS.

## SECTION 14.   MISCELLANEOUS

14.1.   This Contract shall be binding upon and inure to the benefit of the successors, assigns, personal representatives, and heirs of the respective parties hereto, and the covenants, conditions, rights and obligations of this Contract shall run for the full term of this Contract. No assignment of this Contract, in whole or in part, will be made without the prior written consent of the non-assigning party (and shall not relieve the assigning party from liability hereunder), which consent will not be unreasonably withheld or delayed; provided, either party may (i) transfer, sell, pledge, encumber, or assign this Contract or the accounts, revenues, or proceeds hereof in connection with any financing or other financial arrangements, or (ii) transfer its interest to any parent or affiliate by assignment, merger or otherwise without the prior approval of the other party. Upon any such assignment, transfer and assumption, the transferor shall remain principally liable for and shall not be relieved of or discharged from any obligations hereunder.

14.2.   If any provision in this Contract is determined to be invalid, void or unenforceable by any court having jurisdiction, such determination shall not invalidate, void, or make unenforceable any other provision, agreement or covenant of this Contract.

14.3.   No waiver of any breach of this Contract shall be held to be a waiver of any other or subsequent breach.

14.4.   This Contract sets forth all understandings between the parties respecting each transaction subject hereto, and any prior contracts, understandings and representations, whether oral or written, relating to such transactions are merged into and superseded by this Contract and any effective transaction(s). This Contract may be amended only by a writing executed by both parties.

14.5.   The interpretation and performance of this Contract shall be governed by the laws of the jurisdiction as indicated on the Base Contract, excluding, however, any conflict of laws rule which would apply the law of another jurisdiction.

14.6.   This Contract and all provisions herein will be subject to all applicable and valid statutes, rules, orders and regulations of any governmental authority having jurisdiction over the parties, their facilities, or Gas supply, this Contract or transaction or any provisions thereof.

14.7.   There is no third party beneficiary to this Contract.

14.8.   Each party to this Contract represents and warrants that it has full and complete authority to enter into and perform this Contract. Each person who executes this Contract on behalf of either party represents and warrants that it has full and complete authority to do so and that such party will be bound thereby.

14.9.   The headings and subheadings contained in this Contract are used solely for convenience and do not constitute a part of this Contract between the parties and shall not be used to construe or interpret the provisions of this Contract.

14.10.   Unless the parties have elected on the Base Contract not to make this Section 14.10 applicable to this Contract, neither party shall disclose directly or indirectly without the prior written consent of the other party the terms of any transaction to a third party (other than the employees, lenders, royalty owners, counsel, accountants and other agents of the party, or prospective purchasers of all or substantially all of a party's assets or of any rights under this Contract, provided such persons shall have agreed to keep such terms confidential) except (i) in order to comply with any applicable law, order, regulation, or exchange rule, (ii) to the extent necessary for the enforcement of this Contract , (iii) to the extent necessary to implement any transaction, or (iv) to the extent such information is delivered to such third party for the sole purpose of calculating a published index. Each party shall notify the other party of any proceeding of which it is aware which may result in disclosure of the terms of any transaction (other than as permitted hereunder) and use reasonable efforts to prevent or limit the disclosure. The existence of this Contract is not subject to this confidentiality obligation. Subject to Section 13, the parties shall be entitled to all remedies available at law or in equity to enforce, or seek relief in connection with this confidentiality obligation. The terms of any transaction hereunder shall be kept confidential by the parties hereto for one year from the expiration of the transaction.

In the event that disclosure is required by a governmental body or applicable law, the party subject to such requirement may disclose the material terms of this Contract to the extent so required, but shall promptly notify the other party, prior to disclosure, and shall cooperate (consistent with the disclosing party's legal obligations) with the other party's efforts to obtain protective orders or similar restraints with respect to such disclosure at the expense of the other party.

14.11   The parties may agree to dispute resolution procedures in Special Provisions attached to the Base Contract or in a Transaction Confirmation executed in writing by both parties.

DISCLAIMER: The purposes of this Contract are to facilitate trade, avoid misunderstandings and make more definite the terms of contracts of purchase and sale of natural gas. Further, NAESB does not mandate the use of this Contract by any party. NAESB DISCLAIMS AND EXCLUDES, AND ANY USER OF THIS CONTRACT ACKNOWLEDGES AND AGREES TO NAESB'S DISCLAIMER OF, ANY AND ALL WARRANTIES, CONDITIONS OR REPRESENTATIONS, EXPRESS OR IMPLIED, ORAL OR WRITTEN, WITH RESPECT TO THIS CONTRACT OR ANY PART THEREOF, INCLUDING ANY AND ALL IMPLIED WARRANTIES OR CONDITIONS OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY, OR FITNESS OR SUITABILITY FOR ANY PARTICULAR PURPOSE (WHETHER OR NOT NAESB KNOWS, HAS REASON TO KNOW, HAS BEEN ADVISED, OR IS OTHERWISE IN FACT AWARE OF ANY SUCH PURPOSE), WHETHER ALLEGED TO ARISE BY LAW, BY REASON OF CUSTOM OR USAGE IN THE TRADE, OR BY COURSE OF DEALING. EACH USER OF THIS CONTRACT ALSO AGREES THAT UNDER NO CIRCUMSTANCES WILL NAESB BE LIABLE FOR ANY DIRECT, SPECIAL, INCIDENTAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF ANY USE OF THIS CONTRACT.

Copyright © 2002 North American Energy Standards Board, Inc.
All Rights Reserved

NAESB Standard 6.3.1
April 19, 2002

EXHIBIT A

TRANSACTION CONFIRMATION
FOR IMMEDIATE DELIVERY

EXHIBIT A



Date: July  12, 2013

Transaction Confirmation #: ___6_____

This Transaction Confirmation is subject to the Base Contract between Seller and Buyer dated September 1, 2009.  The terms of this Transaction Confirmation are binding unless disputed in writing within 2 Business Days of receipt unless otherwise specified in the Base Contract.

| SELLER: | BUYER: |
|---|---|
| EXCO Operating Company, LP | Chesapeake Energy Marketing, Inc. |
| 12377 Merit Dr Ste 1700 | P. O. Box 18496 |
| Dallas, TX 75251 | Oklahoma City, OK  73154-0496 |
| Attn: Nick Butler | Attn: Contract Administration |
| Phone:  214.706.3451 | Phone: 405.848.8000 |
| Fax:  214.438.1401 | Fax: 405.849.0034 |
| Base Contract No. _____ | Base Contract No. _____ |
| Transporter: _____ | Transporter: _____ |
| Transporter Contract Number: _____ | Transporter Contract Number: _____ |

Contract Price REDACTED
REDACTED

**Delivery Period:  Begin:**     January 1, 2013          **End:**     October 31, 2021

Performance Obligation and Contract Quantity:  (Select One)

Firm (Fixed Quantity):
  *See Schedule Below _____  MMBtus/day
  : EFP

Firm (Variable Quantity):
  _____ MMBtus/day Minimum
  _____ MMBtus/day Maximum
  subject to Section 4.2. at election of
  : Buyer or : Seller

Interruptible:
Up to __MMBtus/day

Delivery Point(s):  Access' Mansfield GGS Converse CDP (Access Meter OMV10320/Acadian Meter HN1405) located in section 12-11N-13W Louisiana.

Copyright © 2002 North American Energy Standards Board, Inc.
All Rights Reserved

Page 1 of 2

NAESB Standard 6.3.1
April 19, 2002

EXHIBIT A

**Special Conditions:**

*Below is a schedule describing the Firm Quantity Seller shall deliver to Buyer at the Delivery Point described above.

REDACTED

REDACTED

| | |
|---|---|
| Seller: EXCO OPERATING COMPANY, LP | Buyer:  CHESAPEAKE ENERGY MARKETING, INC. |
| By: _William L. Boeing_ | By: _James C. Johnson_ |
| Title: _Vice President_ | Title: _President_ |
| Date: _7/12/13_ | Date: _7/9/13_ |

EXHIBIT A

**Exhibit D-2**

Attached to and made a part of that certain Purchase and Sale Agreement by and between
Chesapeake Exploration, L.L.C. and EXCO Operating Company, LP

| TRANSACTION CONFIRMATION<br>FOR IMMEDIATE DELIVERY | EXHIBIT A |
|---|---|

| | |
|---|---|
| **Chesapeake** ENERGY | Date: _____ , 2013<br>Transaction Confirmation #: ___7___ |

This Transaction Confirmation is subject to the Base Contract between Seller and Buyer dated September 1, 2009. The terms of this Transaction Confirmation are binding unless disputed in writing within 2 Business Days of receipt unless otherwise specified in the Base Contract.

| **SELLER:** | **BUYER:** |
|---|---|
| EXCO Operating Company, LP | Chesapeake Energy Marketing, Inc. |
| 12377 Merit Dr Ste 1700 | P. O. Box 18496 |
| Dallas, TX 75251 | Oklahoma City, OK 73154-0496 |
| Attn: Nick Butler | Attn: Contract Administration |
| Phone: 214.706.3451 | Phone: 405.848.8000 |
| Fax:  214.438.1401 | Fax: 405.849.0034 |
| Base Contract No. _____ | Base Contract No. _____ |
| Transporter: | Transporter: |
| Transporter Contract Number: _____ | Transporter Contract Number: _____ |

REDACTED

| | | |
|---|---|---|
| **Delivery Period:** Begin:   April 1, 2013 | | End   June 30, 2032 |

| **Performance Obligation and Contract Quantity:** (Select One) | | |
|---|---|---|
| **Firm (Fixed Quantity):** | **Firm (Variable Quantity):** | **Interruptible:** |
| All gas available at Delivery Point(s) MMBtus/day | _____ MMBtus/day Minimum | Up to ___ MMBtus/day |
| ☐ EFP | _____ MMBtus/day Maximum | |
| | subject to Section 4.2. at election of | |
| | ☐ Buyer or ☐ Seller | |

**Delivery Point(s):** The interconnect(s) located at or near the well pad(s) of Seller's facilities and of Mockingbird Midstream Gas Services, L.L.C. gas gathering systems in the area illustrated on Exhibit "A".

REDACTED

Copyright © 2002 North American Energy Standards Board, Inc.
All Rights Reserved

Page 1 of 2

NAESB Standard 6.3.1
April 19, 2002

EXHIBIT A

**Exhibit D-2**

Attached to and made a part of that certain Purchase and Sale Agreement by and between
Chesapeake Exploration, L.L.C. and EXCO Operating Company, LP

REDACTED

| Seller: EXCO OPERATING COMPANY, LP | Buyer: CHESAPEAKE ENERGY MARKETING, INC. |
|---|---|
| By: _____ | By: _____ |
| Title: _____ | Title: _____ |
| Date: _____ | Date: _____ |

EXHIBIT A

**Exhibit D-2**

Attached to and made a part of that certain Purchase and Sale Agreement by and between
Chesapeake Exploration, L.L.C. and EXCO Operating Company, LP

<table>
<tr><td colspan="2" align="center">TRANSACTION CONFIRMATION<br>FOR IMMEDIATE DELIVERY</td><td align="right">EXHIBIT A</td></tr>
</table>

| | |
|---|---|
| **Chesapeake** ENERGY | Date: _____, 2013<br>Transaction Confirmation #: ___7___ |

This Transaction Confirmation is subject to the Base Contract between Seller and Buyer dated September 1, 2009. The terms of this Transaction Confirmation are binding unless disputed in writing within 2 Business Days of receipt unless otherwise specified in the Base Contract.

| **SELLER:** | **BUYER:** |
|---|---|
| EXCO Operating Company, LP | Chesapeake Energy Marketing, Inc. |
| 12377 Merit Dr Ste 1700 | P. O. Box 18496 |
| Dallas, TX 75251 | Oklahoma City, OK 73154-0496 |
| Attn: Nick Butler | Attn: Contract Administration |
| Phone: 214.706.3451 | Phone: 405.848.8000 |
| Fax: 214.438.1401 | Fax: 405.849.0034 |
| Base Contract No. _____ | Base Contract No. _____ |
| Transporter: _____ | Transporter: _____ |
| Transporter Contract Number: _____ | Transporter Contract Number: _____ |

REDACTED

| | | |
|---|---|---|
| **Delivery Period:** Begin: April 1, 2013 | End June 30, 2032 | |

**Performance Obligation and Contract Quantity:** (Select One)

| **Firm (Fixed Quantity):** | **Firm (Variable Quantity):** | **Interruptible:** |
|---|---|---|
| All gas available at Delivery Point(s) MMBtus/day | _____ MMBtus/day Minimum | Up to __ MMBtus/day |
| ☐ EFP | _____ MMBtus/day Maximum | |
| | subject to Section 4.2. at election of | |
| | ☐ Buyer or ☐ Seller | |

**Delivery Point(s):** The interconnect(s) located at or near the well pad(s) of Seller's facilities and of Mockingbird Midstream Gas Services, L.L.C. gas gathering systems in the area illustrated on Exhibit "A".

REDACTED

Copyright © 2002 North American Energy Standards Board, Inc.
All Rights Reserved

Page 1 of 2

NAESB Standard 6.3.1
April 19, 2002

EXHIBIT B

**Exhibit D-2**

Attached to and made a part of that certain Purchase and Sale Agreement by and between
Chesapeake Exploration, L.L.C. and EXCO Operating Company, LP

REDACTED

| Seller: EXCO OPERATING COMPANY, LP | Buyer:  CHESAPEAKE ENERGY MARKETING, INC. |
|---|---|
| By: _____ | By: _____ |
| Title: _____ | Title: _____ |
| Date: _____ | Date: _____ |

EXHIBIT B

 **EXCO OPERATING COMPANY, LP**
12377 Merit Drive • Suite 1700 • Dallas, Texas 75251

October 7, 2016

*Via Facsimile and Certified Mail Return Receipt Requested*

Chesapeake Energy Marketing, Inc.
Contract Administration
PO Box 18496
Oklahoma City, OK  73154-0496
Fax 405-849-0034

          Re: **Base Contract for Sale and Purchase of Natural Gas** by and between Chesapeake
Energy Marketing, Inc. and EXCO Operating Company, LP ("EXCO Operating"), dated
September 1, 2009 ("Contract")

Ladies and Gentlemen:

          We have recently undergone an internal reorganization in an effort to better serve our
stakeholders. Pursuant to the reorganization, and as a result of an internal merger, the Contract is
now being held and administered by Raider Marketing, LP, a Delaware limited partnership
("Raider").   Raider is a wholly-owned subsidiary within the EXCO organization. Notice
information for Raider Marketing, LP is set forth below:

          Raider Marketing, LP
          c/o EXCO Resources, Inc.
          12377 Merit Drive, Suite 1700
          Dallas, Texas 75257
          Phone: 214-368-2084
          Facsimile: 214-438-1401

Raider's EIN, DUNS number and payment information is as follows:

          Raider Marketing, LP
          Duns Number 080375828
          EIN 81-3634295
          Bank account number 888633356
          Bank Name:  JPMorgan Chase
          Wire Routing Number: 021000021
          ACH Routing Number: 124001545

**EXHIBIT C**

Please process your next payment to Raider at the address and account number above. We will work closely with you to make this integration process as smooth as possible. Please feel free to contact Steve Estes or Lori Kanaman at Raider at the number above with any questions during the transition period.

Sincerely,

Harold L. Hickey,
President of EXCO Operating Company, LP

2

EXHIBIT C

DOCUMENT PAGE # 40



**Raider** Marketing

12377 Merit Drive, Suite 1700 | Dallas, TX 75251 | 214-368-2084 main | 214-438-1401 fax

April 13, 2017

Chesapeake Energy Marketing, LLC
Attn: Contract Administration
P.O. Box 18496
Oklahoma City, OK 73154-0496

Re:    Request for Consent to Assign Gas Sales and Purchase Base Contract by and between Chesapeake Energy Marketing, LLC (f/k/a Chesapeake Energy Marketing, Inc.) ("CEMI") and EXCO Operating Company LP ("EXCO"), dated September 1, 2009, (as amended, the "NAESB") and Transaction Confirmation, dated July 31, 2013, by and between CEMI and EXCO (as amended, the "Confirmation" and together with the NAESB, the "Applicable Agreements")

Dear Chesapeake Energy Marketing, LLC:

Pursuant to that certain Purchase and Sale Agreement, dated April 7, 2017, EXCO has agreed (a) to sell all of its right, title and interest in and to certain assets in Texas (the "Assets") to VOG Palo Verde LP, a Delaware limited partnership ("VOG" and together with its affiliates that are controlled by Venado, the "Venado Group") that is directly or indirectly controlled by Venado Oil and Gas, LLC, a Delaware limited liability company ("Venado") and (b) to cause Raider Marketing, LP, a Texas limited partnership ("Raider"), to assign certain contracts relating to Assets, including the Applicable Agreements, to the Venado Group.

The Venado Group is principally funded by investment affiliates of Kohlberg Kravis Roberts & Co. L.P. Enclosed for your review is a press release providing additional information on the Venado Group. EXCO's and Raider's address is 12377 Merit Drive, Dallas, Suite 1700, Texas 75251. The Venado Group's address is 13501 Galleria Circle, Suite 350, Austin, Texas 78738.

The purpose of this letter is to request your consent under the Applicable Agreements to the assignment of Raider's interest in the Applicable Agreements, to the extent and only to the extent relating to the Assets, to, and among, the Venado Group, as required by the Applicable Agreements. For the avoidance of doubt, this request neither grants additional rights nor diminishes any rights to which you are contractually entitled.

EXHIBIT D

To ensure a smooth transition, we respectfully request your consent by May 12, 2017. Please evidence your consent by executing at the bottom of the following page and returning one copy of this letter to the undersigned by (i) using the enclosed return FedEx envelope, (ii) faxing a copy of your consent to 214-706-3409 to the attention of the undersigned or (iii) scanning and emailing a copy to tfarquharson@EXCOResources.com.   **EXCO, Raider and Venado appreciate your prompt response.**

Should you have any questions regarding this matter, please contact the undersigned at 214-368-2084 or tfarquharson@EXCOResources.com.

Sincerely,

Raider Marketing, LP

By: Raider Marketing GP, LLC, its general partner

By: _____

Tyler Farquharson
Vice President, Chief Financial Officer and Treasurer

By signing below, the undersigned hereby consents to the assignment of the Applicable Agreements as described in this letter.

Consent is granted to be effective this _____ day of _____, 2017

Signature: _____

Name: _____

Email: _____

EXHIBIT D



May 25, 2017

EXCO Operating Company, LP
Attention: Steve Estes
12377 Merit Drive, Suite 1700
Dallas, TX 75251

Re: (i) Base Contract between Chesapeake Energy Marketing, L.L.C. ("CEML") and EXCO Operating Company, LP ("EXCO") dated September 1st, 2009 (the "Contract") and associated Transaction Confirmations #6 and #7 dated July 12th, 2013 and July 31st, 2013, respectively.

Mr. Estes,

Pursuant to Section 10.1 of the Contract, CEML has reasonable grounds for insecurity regarding EXCO's performance of obligations under the Transaction, and hereby demands an irrevocable standby letter of credit as Adequate Assurance of Performance in the amount of Twenty Five Million Dollars ($25,000,000.00). EXCO shall deliver to CEML a standby irrevocable letter of credit substantially in the form of attached Appendix A and from a bank organized under the laws of the United States of America or a foreign bank with a branch office located in the United Sates having a Credit Rating of "A-" or higher by Standard & Poor's Corporation ("S&P") or "A3" or higher by Moody's Investor Services, Inc. ("Moody's) or it successors. Credit Rating shall mean, with respect to the issuing bank, the most recent rating assigned to the entity's senior unsecured long-term debt. The Credit Assurance must be delivered to CEML within 48 hours after your receipt of this letter. Should Credit Assurance not be delivered to CEML's satisfaction within 48 hours of receipt, CEML may terminate one or more of the Transaction Confirmations associated with the Contract.

Please feel free to contact me with any questions.

Best Regards,

Erik Fares
*Vice President and Treasurer*
*Chesapeake Energy Marketing, L.L.C.*
*Office: (405) 935-4405*
*E-mail: erik.fares@chk.com*

**Chesapeake Energy Corporation**
6100 N. Western Ave. • Oklahoma City, OK 73118 • P.O. Box 18496 • Oklahoma City, OK 73154-0496

EXHIBIT E



**EXCO Operating Company, LP**
12377 Merit Drive • Suite 1700 • Dallas, Texas 75251
Phone (214) 368-2084 • Fax (972) 367-3559

May 26, 2017

**Via Email erik.fares@chk.com**

Erik Fares
Vice President and Treasurer
Chesapeake Energy Marketing, L.L.C.
6100 N. Western Ave.
Oklahoma City, OK 73118

Re:   Base Contract between Chesapeake Energy Marketing, L.L.C ("CEML") and EXCO
       Operating Company, LP ("EOC") dated September 1, 2009 (the "Contract") and
       associated Transaction Confirmations #6 and #7 dated July 12, 2013 and July 31, 2013,
       respectively

Dear Mr. Fares:

I am in receipt of your letter dated May 25, 2017 addressed to EOC in regards to the Contract
and associated Transaction Confirmations #6 and #7 dated July 12, 2013 and July 31, 2013,
respectively. The Contract was moved by operation of law through an internal reorganization,
and EOC notified CEML of the same in a letter dated October 7, 2016, which I have enclosed for
your reference. As a result, your recent letter demanding assurance of performance under
Section 10.1 was incorrectly addressed to EOC.

Please feel free to contact me with any questions.

                                        Sincerely,

                                        Steve Estes
                                        Vice President of Marketing

Enclosure

 **EXCO OPERATING COMPANY, LP**
12377 Merit Drive ● Suite 1700 ● Dallas, Texas 75251

October 7, 2016

*Via Facsimile and Certified Mail Return Receipt Requested*

Chesapeake Energy Marketing, Inc.
Contract Administration
PO Box 18496
Oklahoma City, OK  73154-0496
Fax 405-849-0034

      Re: **Base Contract for Sale and Purchase of Natural Gas** by and between Chesapeake Energy Marketing, Inc. and EXCO Operating Company, LP ("EXCO Operating"), dated September 1, 2009 ("Contract")

Ladies and Gentlemen:

      We have recently undergone an internal reorganization in an effort to better serve our stakeholders. Pursuant to the reorganization, and as a result of an internal merger, the Contract is now being held and administered by Raider Marketing, LP, a Delaware limited partnership ("Raider"). Raider is a wholly-owned subsidiary within the EXCO organization. Notice information for Raider Marketing, LP is set forth below:

          Raider Marketing, LP
          c/o EXCO Resources, Inc.
          12377 Merit Drive, Suite 1700
          Dallas, Texas 75257
          Phone: 214-368-2084
          Facsimile: 214-438-1401

Raider's EIN, DUNS number and payment information is as follows:

          Raider Marketing, LP
          Duns Number 080375828
          EIN 81-3634295
          Bank account number 888633356
          Bank Name:  JPMorgan Chase
          Wire Routing Number: 021000021
          ACH Routing Number: 124001545

**EXHIBIT F**

Please process your next payment to Raider at the address and account number above. We will work closely with you to make this integration process as smooth as possible. Please feel free to contact Steve Estes or Lori Kanaman at Raider at the number above with any questions during the transition period.

Sincerely,

Harold L. Hickey,
President of EXCO Operating Company, LP

2

DocuSign Envelope ID: E0391560-B191-4FFB-8679-EBE09E979DE3

# CHESAPEAKE
## *ENERGY*

May 30, 2017

EXCO Operating Company, LP
Attention: Steve Estes
12377 Merit Drive, Suite 1700
Dallas, TX 75251

Re: (i) Base Contract between Chesapeake Energy Marketing, L.L.C. ("CEML") and EXCO Operating Company, LP ("EXCO") dated September 1st, 2009 (the "Contract") and associated Transaction Confirmations #6 and #7 dated July 12th, 2013 and July 31st, 2013, respectively.

Mr. Estes,

We are in receipt of your May 26, 2017 letter regarding the Seller under the above mentioned Base Contract as "now being held and administered by Raider Marketing, LP". Chesapeake does not recognize that Raider, a wholly-owned subsidiary of EXCO, owns an interest in the Base Contract or associated Transaction Confirmations nor has Chesapeake consented to any assignment of such agreements to Raider which consent is required for any transfer of the Base Contract to any entity other than an affiliate of EXCO. It is unclear to Chesapeake Raider's relationship to EXCO Operating Company, LP as well as Raider's interest, if any, in the Base Contract nor has Chesapeake seen any proposed form of assignment.

Nevertheless, should Raider be found a party to the Base Contract, the Base Contract specifically states that "Upon any such assignment, transfer and assumption, the transferor shall remain principally liable for and shall not be relieved of or discharged from any obligations hereunder." Thus, EXCO continues to be bound by the Financial Responsibility provisions of the Base Contract and is obligated to post an irrevocable standby letter of credit by the end of today as demanded in Chesapeake's May 26, 2017 letter. As stated in such letter, CEML has reasonable grounds for insecurity regarding EXCO's performance of obligations under the Transaction as well as CEML has reasonable grounds for insecurity regarding Raider's performance obligations. Chesapeake anticipates receiving the Credit Assurance as soon as possible today. Should Credit Assurance not be delivered to CEML's satisfaction, CEML may terminate one or more of the Transaction Confirmations associated with the Base Contract.

Please feel free to contact me with any questions.

EXHIBIT G

DocuSign Envelope ID: E0391560-B191-4FFB-8679-EBE09E979DE3

Best Regards,

Erik Fares
*Vice President and Treasurer*
*Chesapeake Energy Marketing, L.L.C.*
*Office: (405) 935-4405*
*E-mail: erik.fares@chk.com*

Chesapeake Energy Corporation

**EXHIBIT G**

DocuSign Envelope ID: E0391560-B191-4FFB-8679-EBE09E979DE3

| From: | Misty Wilson |
|---|---|
| To: | blopez@raidermarketing.com |
| Subject: | Termination Notice for Base Contract dated September 1st, 2009 and associated Transaction Confirmation #7 |
| Date: | Wednesday, May 31, 2017 11:09:00 AM |
| Attachments: | 95353 Termination Notice.pdf |

Ms. Lopez,

Please see the attached Termination Notice for the Base Contract between Chesapeake Energy Marketing, L.L.C. and EXCO Operating Company, LP dated September 1st, 2009 and the associated Transaction Confirmation #7 dated July 31st, 2013. The termination for Transaction Confirmation #7 is effective May 31, 2017.

Please let me know if you have any questions.

Thank you,
*Misty Wilson*
Supervisor - Contract Administration
Chesapeake Energy Corporation
Office: 405-935-4512
Mobile: 405-208-1998
Fax: 405-849-4512
Email: misty.wilson@chk.com
Chesapeake logo



DocuSign Envelope ID: E0391560-B191-4FFB-8679-EBE09E979DE3


**CHESAPEAKE**
*ENERGY*

May 31, 2017


EXCO Operating Company, LP
Attn: Steve Estes
12377 Merit Drive, Suite 1700
Dallas, TX 75251


RE:   Base Contract between Chesapeake Energy Marketing, L.L.C. ("CEML") and EXCO Operating
      Company, LP ("EXCO") dated September 1st, 2009 (the "Contract") and associated Transaction
      Confirmation #7 dated July 31st, 2013.


Dear Mr. Estes:

On May 25, 2017 CEML requested EXCO provide a letter of credit as Adequate Assurance of
Performance pursuant to Section 10.1 of the above referenced Contract in support of the transactions
thereunder.  As of May 30, 2017, CEML has yet to receive the letter of credit.  Therefore, pursuant to
Section 10.2(viii) of the Base Contract, an Event of Default has occurred and CEML hereby terminates
Transaction Confirmation #7 effective May 31, 2017.

Please feel free to contact me with any questions.

Sincerely,

DocuSigned by:

*Sarika Jewell*

A81687694E1F417...

Sarika Jewell
Vice President - Marketing



CC:   EXCO Operating Company, LP
      Attn: Contract Administration
      12377 Merit Drive, Suite 1700
      Dallas, TX 75251

**Chesapeake Energy Corporation**
P.O. Box 18496 • Oklahoma City, OK 73154-0496 • 6100 N. Western Avenue • Oklahoma City, OK 73118
405.935.4511• fax 405.849.4512 • kelly.butcher@chk.com

EXHIBIT H

DocuSign Envelope ID: E0391560-B191-4FFB-8679-EBE09E979DE3

Chesapeake Energy Marketing, LLC

2

EXHIBIT H



**EXCO Operating Company, LP**
12377 Merit Drive • Suite 1700 • Dallas, Texas 75251
Phone (214) 368-2084 • Fax (972) 367-3559

May 31, 2017

**Via Email and Facsimile**

Sarika Jewell
Chesapeake Energy Marketing, LLC
6100 N. Western Avenue
Oklahoma City, OK 73118

RE: Gas Sales and Purchase Base Contract by and between Chesapeake Energy Marketing, LLC (f/k/a Chesapeake Energy Marketing, Inc., "CEML") and Raider Marketing, LP (as successor to EXCO Operating Company LP, "Raider"), dated September 1, 2009, (the "Contract") and Transaction Confirmation #7, dated July 31, 2013, by and between CEML and Raider ("Transaction #7").

Ms. Jewell:

EXCO Operating Company, LP ("EXCO") is in receipt of CEML's alleged termination notice dated May 31, 2017, with respect to Transaction #7 that was addressed to EXCO (the "Alleged Termination Notice").

As previously explained in EXCO's letters to CEML dated May 26, 2017, and October 7, 2016, each of which is enclosed herewith and incorporated by reference herein, Raider became CEML's counterparty to the Contract and Transaction #7 on August 18, 2016.[1] EXCO is not a party to the Contract or Transaction #7. Thus, as previously detailed by EXCO, CEML sent its May 25, 2017 letter (as well as its May 30, 2017 letter) and its Alleged Termination Notice to the wrong entity.

As EXCO is not the appropriate party to receive any notices or communications under or regarding the Contract, the Alleged Termination Notice was not proceeded by proper notice and is an invalid termination of Transaction #7. CEML should direct any and all future notices and communications regarding the Contract and Transaction #7 to Raider.

---

[1] Again, for added clarity and for the avoidance of doubt, Raider replaced EXCO as party to the Contract and Transaction #7 as of August 18, 2016 as a result of (as previously detailed in EXCO's letters to CBML dated May 26, 2017, and October 7, 2016) a devise merger of EXCO to Raider.

EXHIBIT I

Please let the undersigned know if you need additional information with respect to this matter.

Regards,

EXCO Operating Company, LP

By: EXCO Partners OLP GP, LLC, its general partner

By: _____

Name: Harold Hickey

Title:   Chief Executive Officer and President

CC:   P.O. Box 18496
        Oklahoma City, OK 7315400496
        Attn: Contract Administration
        Fax: 405-849-0034

Enclosures:
        EXCO Response Letter, dated May 26, 2017
        EXCO Notice of Transfer and Administration, dated October 7, 2016

*Signature Page to EXCO Response to CEML Alleged Termination Notice*

EXHIBIT I



**EXCO Operating Company, LP**
12377 Merit Drive • Suite 1700 • Dallas, Texas 75251
Phone (214) 368-2084 • Fax (972) 367-3559

May 26, 2017

**Via Email erik.fares@chk.com**

Erik Fares
Vice President and Treasurer
Chesapeake Energy Marketing, L.L.C.
6100 N. Western Ave.
Oklahoma City, OK 73118

Re:   Base Contract between Chesapeake Energy Marketing, L.L.C ("CEML") and EXCO
      Operating Company, LP ("EOC") dated September 1, 2009 (the "Contract") and
      associated Transaction Confirmations #6 and #7 dated July 12, 2013 and July 31, 2013,
      respectively

Dear Mr. Fares:

I am in receipt of your letter dated May 25, 2017 addressed to EOC in regards to the Contract
and associated Transaction Confirmations #6 and #7 dated July 12, 2013 and July 31, 2013,
respectively. The Contract was moved by operation of law through an internal reorganization,
and EOC notified CEML of the same in a letter dated October 7, 2016, which I have enclosed for
your reference. As a result, your recent letter demanding assurance of performance under
Section 10.1 was incorrectly addressed to EOC.

Please feel free to contact me with any questions.

Sincerely,

Steve Estes
Vice President of Marketing

Enclosure

EXHIBIT I

DOCUMENT PAGE # 54

 **EXCO OPERATING COMPANY, LP**
12377 Merit Drive • Suite 1700 • Dallas, Texas 75251

October 7, 2016

_Via Facsimile and Certified Mail Return Receipt Requested_

Chesapeake Energy Marketing, Inc.
Contract Administration
PO Box 18496
Oklahoma City, OK  73154-0496
Fax 405-849-0034

Re: **Base Contract for Sale and Purchase of Natural Gas** by and between Chesapeake
Energy Marketing, Inc. and EXCO Operating Company, LP ("EXCO Operating"), dated
September 1, 2009 ("Contract")

Ladies and Gentlemen:

We have recently undergone an internal reorganization in an effort to better serve our
stakeholders. Pursuant to the reorganization, and as a result of an internal merger, the Contract is
now being held and administered by Raider Marketing, LP, a Delaware limited partnership
("Raider").  Raider is a wholly-owned subsidiary within the EXCO organization. Notice
information for Raider Marketing, LP is set forth below:

> Raider Marketing, LP
> c/o EXCO Resources, Inc.
> 12377 Merit Drive, Suite 1700
> Dallas, Texas 75257
> Phone: 214-368-2084
> Facsimile: 214-438-1401

Raider's EIN, DUNS number and payment information is as follows:

> Raider Marketing, LP
> Duns Number 080375828
> EIN 81-3634295
> Bank account number 888633356
> Bank Name:  JPMorgan Chase
> Wire Routing Number: 021000021
> ACH Routing Number: 124001545

**EXHIBIT I**

Please process your next payment to Raider at the address and account number above. We will work closely with you to make this integration process as smooth as possible. Please feel free to contact Steve Estes or Lori Kanaman at Raider at the number above with any questions during the transition period.

Sincerely,

Harold L. Hickey,
President of EXCO Operating Company, LP

2

EXHIBIT I

DOCUMENT PAGE # 56

DocuSign Envelope ID: E0391560-B191-4FFB-8679-EBE09E979DE3

**CHESAPEAKE**
*ENERGY*

**Sarika Jewell**
*Vice President – Marketing, Chesapeake Energy Marketing, LLC*

May 31, 2017

EXCO Operating Company, LP
Attn: Steve Estes
12377 Merit Drive, Suite 1700
Dallas, TX 75251

Raider Marketing, LP
c/o EXCO Resources, Inc.
12377 Merit Drive, Suite 1700
Dallas, Texas 75251

RE:   Base Contract between Chesapeake Energy Marketing, L.L.C. ("Chesapeake") and EXCO Operating Company, LP ("EXCO") dated September 1st, 2009 (the "Contract") and associated Transaction Confirmation #7 dated July 31st, 2013.

Dear Mr. Estes and Mr. Farquharson:

On May 25, 2017 CEML requested EXCO provide a letter of credit as Adequate Assurance of Performance pursuant to Section 10.1 of the above referenced Contract in support of the transactions thereunder.  As of the 48 hour deadline on May 30, 2017, neither EXCO nor Raider Marketing, L.P. ("Raider") did not take any action to post sufficient security.  In addition, on May 30, 2017, as set forth in the letter attached hereto, Chesapeake provided notice that Chesapeake does not recognize any transfer to Raider nor was consent granted to a transfer of the Contract to Raider.  Regardless of any transfer, EXCO remains principally liable for all obligations under the Contract including any Financial Responsibility obligations. Lastly, in regards to notices, the October 7, 2016 letter from EXCO regarding a reorganization states that notice information under the Contract shall be sent care of EXCO Resources at the same address referenced above.  The May 25th demand for Adequate Assurance in addition to the May 30th letter put Raider on notice of Chesapeake's demand for sufficient security.

At this time, neither EXCO nor Raider has provided Adequate Assurance of Performance and are in Default under the Contract.   Thus, as set forth in our previous letter of this same date to EXCO and which was also sent via e-mail to Raider, pursuant to Section 10.2(viii) of the Base Contract, an Event of Default has occurred and CEML hereby terminates Transaction Confirmation #7 effective May 31, 2017.  As of June 1, 2017 Chesapeake will no longer recognize receipt of volumes under Chesapeake's Gas Gathering Agreement with Mockingbird Midstream Gas Services.

Please feel free to contact me with any questions.

Sincerely,

Sarika A. Jewell
Sarika Jewell
Vice President – Marketing

**Chesapeake Energy Corporation**
P.O. Box 18496 | Oklahoma City, OK 73101-0496 | 6100 N. Western Avenue | Oklahoma City, OK 73118
405-935-8883 | fax 405-849-8883 | Sarika.Jewell@chk.com

EXHIBIT J

| | |
|---|---|
| **From:** | Steve Estes - RAIDER |
| **Sent:** | Thursday, June 01, 2017 10:17 AM |
| **To:** | Sarika Jewell |
| **Cc:** | Hal Hickey; Heather Lamparter; Tyler Farquharson |
| **Subject:** | Request for LC |

Sarika:

In response to Chesapeake's letter dated May 31, 2017 to Raider Marketing, LP, Raider is hereby notifying Chesapeake of its intent to post a letter of credit sufficient to meet Chesapeake's demand for credit support as it relates to Transaction Confirmation #7 dated July 31, 2013.  Per our conversation of a few days ago, it is my understanding that the portion of the demand that relates to Transaction Confirmation #7 is $19mm.  Please confirm that the correct amount of the letter of credit demand related to Transaction Confirmation #7 is $19mm.  Following your confirmation, Raider will follow up with Chesapeake's credit group to finalize the letter of credit.

**Raider** Marketing

Steve Estes
President
972-367-3533 office
214-300-1573 cell

1

**EXHIBIT K**

**DOCUMENT PAGE # 58**

**From:** Sarika Jewell <Sarika.Jewell@chk.com>
**Date:** May 31, 2017 at 6:38:35 PM CDT
**To:** Steve Estes - RAIDER <sestes@raidermarketing.com>, Hal Hickey <HHickey@excoresources.com>, "tfarquharson@EXCOResources.com" <tfarquharson@EXCOResources.com>, April L'Hoste <alhoste@EXCOResources.com>
**Cc:** Jonice Meziere <jonice.meziere@chk.com>, Nick Dell'Osso <nick.dellosso@chk.com>, Richard Easterly <richard.easterly@chk.com>, "Jason Elder" <jason.elder@chk.com>, Erik Fares <erik.fares@chk.com>, Claudio Rubio <claudio.rubio@chk.com>
**Subject: EXT: New transaction confirmation - Eagle Ford**

Steve,

Chesapeake was contacted by Williams (Walt Bennett) regarding a potential way for EXCO to continue flowing its Eagle Ford gas on a month to month basis at a shipper rate.

Chesapeake is willing to consider that option by entering into a new transaction confirmation (attached). We will agree to a delivery period beginning 6/1/17 and ending 7/31/17 with a month to month extension in sole discretion of Chesapeake. Intent is for EXCO and Williams to have their own separate gathering contract in place by 7/31/17.

If the attached is acceptable, please send us an executed copy back by EOB today. Otherwise, Chesapeake will not recognize receipt of EXCO Eagle Ford volumes starting tomorrow.

Thank you,
*Sarika Jewell*
Vice President - Marketing
Chesapeake Energy Corporation
Office: 405-935-8883
Mobile: 405-426-5093
Fax: 405-849-8883
Email: sarika.jewell@chk.com



Chesapeake
ENERGY

---

This email (and attachments if any) is intended only for the use of the individual or entity to which it is addressed, and may contain information that is confidential or privileged and exempt from disclosure under applicable law. If the reader of this email is not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by return email and destroy all copies of the email (and attachments if any).

CONFIDENTIALITY NOTICE This electronic mail transmission is confidential, may be privileged and should be read or retained only by the intended recipient. If you have received this transmission in error, please immediately notify the sender and delete it from your system.

2

EXHIBIT L

TRANSACTION CONFIRMATION

# CHESAPEAKE
## *ENERGY*

Date: May 31, 2017

Transaction Confirmation #: 8

This Transaction Confirmation is subject to the Base Contract between Seller and Buyer dated September 1, 2009.  The terms of this Transaction Confirmation are binding unless disputed in writing within 2 Business Days of receipt unless otherwise specified in the Base Contract.

| SELLER: | BUYER: |
|---|---|
| EXCO Operating Company, LP | Chesapeake Energy Marketing, L.L.C. |
| 12377 Merit Dr Ste 1700 | P. 0. Box 18496 |
| Dallas, TX 75251 | Oklahoma City, OK 73154-0496 |
| Attn: Nick Butler | Attn: Contract Administration |
| Phone: 214.706.3451 | Phone: 405.848.8000 |
| Fax: 214.438.1401 | Fax: 405 .849.0034 |
| Base Contract No. _____ | Base Contract No. _____ |
| Transporter: _____ | Transporter: _____ |
| Transporter Contract Number: _____ | Transporter Contract Number: _____ |

Contract Price: REDACTED

REDACTED

| Delivery Period:  Begin: June 1, 2017 | End: July 31, 2017 and continuing month to month thereafter unless terminated upon fifteen (15) days' notice by CEML in its sole discretion. |
|---|---|

**Performance Obligation and Contract Quantity:**  (Select One)

| **Firm (Fixed Quantity):** | **Firm (Variable Quantity):** | **Interruptible:** |
|---|---|---|
| All gas available at Delivery Point(s) | _____ MMBtus/day Minimum | Up to _____ MMBtus/day |
| ☐ EFP | _____ MMBtus/day Maximum | |
| | subject to Section 4.2. at election of | |
| | ☐ Buyer or ☐ Seller | |

**Delivery Point(s):** The interconnect(s) located at or near the well pad(s) of Seller's facilities and of Mockingbird Midstream Gas Services, L.L.C. Gas Gathering systems in the area illustrated on Exhibit "A".

REDACTED

EXHIBIT L

DOCUMENT PAGE # 60

REDACTED

| | |
|---|---|
| Seller: EXCO OPERATING COMPANY, LP<br>By: EXCO Partners OLP GP, LLC, its General Partner<br><br>By: _____<br><br>Title: _____<br><br>Date: _____ | Buyer:  Chesapeake Energy Marketing, L.L.C.<br><br>By: _____<br><br>Title: Sarika Jewell – Vice President, Marketing<br><br>Date: _____ |

EXHIBIT L



12377 Merit Drive, Suite 1700 | Dallas, TX 75251 | 214-368-2084 main | 214-438-1401 fax

June 1, 2017

**<u>Via Email and Facsimile</u>**

Chesapeake Energy Marketing, LLC
6100 N. Western Avenue
Oklahoma City, OK 73118
Attn: Sarika Jewell, Vice President - Marketing

Re:     Gas Sales and Purchase Base Contract by and between Chesapeake Energy Marketing, LLC (f/k/a Chesapeake Energy Marketing, Inc.) ("CEML") and Raider Marketing, LP (as successor by merger to EXCO Operating Company LP) ("Raider"), dated September 1, 2009, (the "Contract") and Transaction Confirmation #7, dated July 31, 2013, by and between CEML and Raider (as successor by merger to EXCO Operating Company LP) (the "Confirmation" and together with the NAESB, the "Applicable Agreements")

Ms. Jewell:

Reference is made to that certain request to assign the Applicable Agreements, dated April 13, 2017, from Raider to CEML (the "Consent Request"). A copy of that request is included for your reference. To date, Raider has not received a response from CEML to the Consent Request.

While Raider has yet to hear from CEML, Raider recently learned indirectly from VOG Palo Verde LP, a Delaware limited partnership ("VOG" and together with its affiliates, "Venado"), that CEML has declined to consent to the proposed assignment of the Applicable Agreements based on (a) credit concerns relating to VOG and (b) a request to see the form of assignment of the Applicable Agreements. Raider also recently learned indirectly from VOG of Venado's communications to CEML May 30, 2017 and May 31, 2017, pursuant to which (i) Venado provided to CEML the form of assignment of the Applicable Agreements and (ii) notwithstanding the fact that CEML does not have reasonable grounds to request financial assurances from Venado, Venado addressed CEML's credit concerns with the offer to provide Adequate Assurance of Performance (as defined in the Contract) in the form of a $9 million standby irrevocable letter of credit and, if requested by CEML, a guarantee by VOG. The consent to assign standard included in the Applicable Agreements is "not [to] be unreasonably withheld or delayed" and, given that Venado has satisfied the conditions upon which CEML's denial of request was predicated, CEML is deemed to have consented to the Consent Request. Any further withholding or delaying of CEML's consent to the Consent Request is and shall be deemed to be unreasonable and not in good faith.

EXHIBIT M

This letter also shall serve as notice to CEML of CEML's breach of its performance obligations under the Applicable Agreements. Raider is in receipt of a letter from CEML to EXCO Operating Company, LP dated May 31, 2017 stating that the Confirmation had been terminated. As Raider has previously advised, CEML failed to provide Raider proper notice under the Contract with respect to any demand for Adequate Assurances. Accordingly, CEML's alleged termination of the Confirmation is improper, invalid, and not operative, and Raider expects CEML to again perform its obligations under the Applicable Agreements.

Finally, Raider encloses additional information in connection with my email to Sarika Jewell this morning regarding CEML's demand for a letter of credit ("LC"). In that email, I requested written confirmation of what CEML had previously agreed to be the correct amount of the assurance for Transaction Confirmation #7; i.e., $19 million. Because CEML has yet to provide the requested written confirmation, Raider has submitted an application to JP Morgan Chase ("JPM") for a $25 million irrevocable standby LC on a form substantially similar to the one provided by CEML in CEML's initial demand for assurance for both Transaction Confirmations #7 and #6, with Chesapeake Energy Marketing, L.L.C. as beneficiary. Raider will advise you as soon as JPM issues the LC.

Should you have any questions regarding this matter, please contact Raider directly via the undersigned at sestes@raidermarketing.com or 972-367-3533.

Sincerely,

Raider Marketing, LP

By: Raider Marketing GP, LLC, its general partner

By: _____

Steve Estes
President

CC:     P.O. Box 18496
        Oklahoma City, OK 73154-0496
        Attn: Contract Administration
        Fax: 405-849-0034

EXHIBIT M



12377 Merit Drive, Suite 1700 | Dallas, TX 75251 | 214-368-2084 main | 214-438-1401 fax

April 13, 2017

Chesapeake Energy Marketing, LLC
Attn: Contract Administration
P.O. Box 18496
Oklahoma City, OK 73154-0496

Re:     Request for Consent to Assign Gas Sales and Purchase Base Contract by and between
        Chesapeake Energy Marketing, LLC (f/k/a Chesapeake Energy Marketing, Inc.)
        ("CEMI") and EXCO Operating Company LP ("EXCO"), dated September 1, 2009, (as
        amended, the "NAESB") and Transaction Confirmation, dated July 31, 2013, by and
        between CEMI and EXCO (as amended, the "Confirmation" and together with the
        NAESB, the "Applicable Agreements")

Dear Chesapeake Energy Marketing, LLC:

        Pursuant to that certain Purchase and Sale Agreement, dated April 7, 2017, EXCO has
agreed (a) to sell all of its right, title and interest in and to certain assets in Texas (the "Assets")
to VOG Palo Verde LP, a Delaware limited partnership ("VOG" and together with its affiliates
that are controlled by Venado, the "Venado Group") that is directly or indirectly controlled by
Venado Oil and Gas, LLC, a Delaware limited liability company ("Venado") and (b) to cause
Raider Marketing, LP, a Texas limited partnership ("Raider"), to assign certain contracts relating
to Assets, including the Applicable Agreements, to the Venado Group.

        The Venado Group is principally funded by investment affiliates of Kohlberg Kravis
Roberts & Co. L.P. Enclosed for your review is a press release providing additional information
on the Venado Group. EXCO's and Raider's address is 12377 Merit Drive, Dallas, Suite 1700,
Texas 75251. The Venado Group's address is 13501 Galleria Circle, Suite 350, Austin, Texas
78738.

        The purpose of this letter is to request your consent under the Applicable Agreements to
the assignment of Raider's interest in the Applicable Agreements, to the extent and only to the
extent relating to the Assets, to, and among, the Venado Group, as required by the Applicable
Agreements. For the avoidance of doubt, this request neither grants additional rights nor
diminishes any rights to which you are contractually entitled.

EXHIBIT M

DOCUMENT PAGE # 64

To ensure a smooth transition, we respectfully request your consent by May 12, 2017. Please evidence your consent by executing at the bottom of the following page and returning one copy of this letter to the undersigned by (i) using the enclosed return FedEx envelope, (ii) faxing a copy of your consent to 214-706-3409 to the attention of the undersigned or (iii) scanning and emailing a copy to tfarquharson@EXCOResources.com. **EXCO, Raider and Venado appreciate your prompt response.**

Should you have any questions regarding this matter, please contact the undersigned at 214-368-2084 or tfarquharson@EXCOResources.com.

Sincerely,

Raider Marketing, LP

By: Raider Marketing GP, LLC, its general partner

By: _____

Tyler Farquharson
Vice President, Chief Financial Officer and Treasurer

By signing below, the undersigned hereby consents to the assignment of the Applicable Agreements as described in this letter.

Consent is granted to be effective this _____ day of _____, 2017

Signature:_____

Name:_____

Email:_____

**EXHIBIT M**



**KKR AND VENADO FORM PARTNERSHIP TO PURSUE OIL AND GAS
INVESTMENTS IN EAGLE FORD SHALE**

September 29th, 2016

HOUSTON & AUSTIN, Texas—(BUSINESS WIRE)—KKR and Venado Oil and Gas, LLC ("Venado") today announced a partnership to consolidate proven assets in the Eagle Ford Shale of South Texas. The partnership is principally funded by KKR's Energy Income and Growth Fund I ("EIGF").

Venado is led by CEO Scott Garrick and a core team of individuals who have operated in the Eagle Ford since the play's inception. Venado intends to apply its expertise to acquire and enhance Eagle Ford assets through a focus on operational efficiency, technical innovation and strong community relations.

David Rockecharlie, Member and Head of Energy Real Assets ("ERA") for KKR, stated, "We have known Scott for many years and believe he and his team have the experience and differentiated business approach necessary to acquire attractive Eagle Ford assets and enhance long-term value through superior technical and operational execution. KKR has a long history investing in the Eagle Ford, and we look forward to expanding our existing Eagle Ford asset position in partnership with Venado."

Scott Garrick, CEO of Venado, added, "We are excited to partner with KKR in the Eagle Ford, where we both see the opportunity to build a large scale, long-term business. Both Venado's management and KKR have been active in the Eagle Ford since the early phase of development, and we share the same vision of the next phase of its evolution. This provides an ideal foundation for a strong partnership."

Venado's business plan is a natural fit within KKR ERA's asset-based investment strategy that provides flexible capital solutions to upstream operators. KKR has made more than ten investments in the Eagle Ford to date. KKR ERA manages a portfolio of oil and gas assets in numerous unconventional and conventional resource areas across the United States, including developments in the Eagle Ford, Bakken, Barnett, DJ, Haynesville, Marcellus, Permian and Utica.

**About KKR**

KKR is a leading global investment firm that manages investments across multiple asset classes including private equity, energy, infrastructure, real estate, credit and hedge funds. KKR aims to generate attractive investment returns by following a patient and disciplined investment approach, employing world-class people, and driving growth and value creation at the asset level. KKR invests its own capital alongside its partners' capital and brings opportunities to others through its capital markets business. References to KKR's investments may include the activities of its sponsored funds. For additional information about KKR & Co. L.P. (NYSE:KKR), please visit KKR's website at www.kkr.com and on Twitter @KKR_Co.

**About Venado Oil and Gas**

Venado Oil & Gas is a private company focused on the acquisition and exploitation of upstream oil and gas assets. Headquartered in Austin, Texas, its primary objective is to build and operate a portfolio of producing oil and gas wells and drilling locations in the Eagle Ford Shale. For additional information about Venado Oil & Gas, please visit www.vogllc.com.

EXHIBIT M

**Application and Agreement for Irrevocable
Standby Letter of Credit**

J.P.Morgan

REDACTED

DOCUMENT PAGE # 68

EXHIBIT M

DOCUMENT PAGE # 69

EXHIBIT M

Rev. 03.01.2015

3

DOCUMENT PAGE # 70

EXHIBIT M

4

Rev. 03.01.2015

DOCUMENT PAGE # 71

EXHIBIT M

5

Rev. 03.01.2015

DOCUMENT PAGE # 72

EXHIBIT M

Rev. 03.01.2015

9

DOCUMENT PAGE # 73

EXHIBIT M

Rev. 03.01.2015

7

DOCUMENT PAGE # 74

EXHIBIT M

Rev. 03.01.2015

8

EXHIBIT M

Rev. 03.01.2015

6

DOCUMENT PAGE # 76

EXHIBIT M

10

Rev. 03.01.2015

DOCUMENT PAGE # 77

EXHIBIT M

11

Rev. 03.01.2015

DOCUMENT PAGE # 78

EXHIBIT M

Rev. 03.01.2015

12

DOCUMENT PAGE # 79

EXHIBIT M

13

Rev. 03.01.2015