IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RAIDER MARKETING, LP,<br>EXCO RESOURCES, INC.,<br>EXCO OPERATING COMPANY, LP,<br>and EXCO LAND COMPANY, LLC,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>CHESAPEAKE ENERGY MARKETING,<br>LLC and CHESAPEAKE ENERGY<br>CORPORATION,<br><br>　　　　Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:17-CV-1516-N |

## PLAINTIFFS' AMENDED COMPLAINT

Pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, Raider Marketing, LP ("Raider"); EXCO Resources, Inc. ("EXCO Resources"); EXCO Operating Company, LP ("EXCO Operating"); and EXCO Land Company, LLC ("EXCO Land" and, with EXCO Operating and EXCO Resources, collectively "EXCO") (Raider and EXCO, collectively, "Plaintiffs") file this Amended Complaint against Chesapeake Energy Marketing, LLC ("CEML") and Chesapeake Energy Corporation ("CEC" and, with CEML, collectively "Chesapeake" or "Defendants") and in support show:

## I.    INTRODUCTION

1.    Raider is a wholly-owned subsidiary of EXCO Resources, an oil and natural gas company headquartered in Dallas, Texas.  Raider and CEML are parties to a Base Contract for Sale and Purchase of Natural Gas ("Base Contract").  CEML is a wholly owned subsidiary of CEC.  The Base Contract and a related agreement—Transaction Confirmation #7 (together, the "Contracts")—outline a process whereby Chesapeake buys gas delivered by Raider at specified

delivery points, from April 2013 until June 2032, and Raider pays Chesapeake for Chesapeake's costs associated with transporting and processing the gas under a mutually agreed upon price/cost structure. Because the gas at issue is produced as a by-product of oil production, and the costs of transporting and processing the gas exceed its value, Raider—despite selling the gas to Chesapeake—also pays Chesapeake under the agreed price/cost structure.

2.      Chesapeake now wants to walk away from the Contracts because it is unhappy with the price/cost structure that it agreed to. In an effort to force Raider to renegotiate the price/cost structure and duration of the Contracts, Chesapeake thwarted the $300 million sale of EXCO Resources' South Texas oil and natural gas properties by unreasonably withholding consent to assign the Contracts and purporting to terminate the Contracts on improper grounds.

3.      Chesapeake attempts to excuse its unlawful conduct by pointing to Section 10.1 of the Base Contract, which allows Chesapeake to seek adequate financial assurance of Raider's ability to perform under the Contracts. But that provision conditions Chesapeake's right to demand adequate assurance on the existence of *reasonable* grounds for any alleged insecurity, and Chesapeake had none.

4.      Chesapeake also tries to rely on Section 14.1 of the Base Contract, which requires Chesapeake's consent for certain assignments or transfers to third parties, to object to Raider's exercise of rights under the Contracts and to the assignments for EXCO's transaction. That provision, however, lets Chesapeake withhold consent to the assignment of the Contracts to third parties only if doing so is reasonable. Chesapeake had no reasonable basis for either withholding or delaying its consent.

5.      In purporting to terminate the Contracts, Chesapeake caused the wells from which Raider receives the gas it sells to be shut-in. Because EXCO cannot produce oil without

**PLAINTIFFS' AMENDED COMPLAINT**

producing and transporting (or otherwise disposing of) the natural gas associated with oil production, Chesapeake's refusal to purchase Raider's gas forced a large number of EXCO's oil-producing wells to be shut-in—dramatically lowering EXCO's oil production—and required Raider's gas to be wasted through "flaring."

6.      Beyond the substantial harm wreaked on Raider's and EXCO's operations, Chesapeake's conduct derailed the sale of EXCO's South Texas oil and gas properties, which was scheduled to close on June 1, 2017.  The loss of this unique business opportunity—critical to EXCO's and Raider's operations and business strategy—severely harmed Raider and EXCO.

7.      Through this lawsuit, Plaintiffs seek damages caused by Chesapeake's breaches of contract and the implied covenant of good faith and fair dealing, and tortious interference.

## II.      THE PARTIES

8.      Plaintiff Raider Marketing, LP is a Delaware limited partnership and wholly-owned subsidiary of EXCO Resources, Inc.  The partners of Raider Marketing, LP are EXCO Resources, Inc. and Raider Marketing GP, LLC.  The sole member of Raider Marketing GP, LLC is EXCO Resources, Inc.  Accordingly, as set forth below, Raider Marketing, LP is a citizen of Texas.

9.      Plaintiff EXCO Resources, Inc. is a Texas corporation with its principal place of business at 12377 Merit Drive, Suite 1700, Dallas, Texas 75251.  Accordingly, EXCO Resources, Inc. is a citizen of Texas.

10.     Plaintiff EXCO Operating Company, LP is a Delaware limited partnership and wholly-owned subsidiary of EXCO Resources, Inc.  Its partners are EXCO Partners OLP GP, LLC and EXCO GP Partners Old, LP.  The sole member of EXCO Partners OLP GP, LLC is EXCO GP Partners Old, LP.  The partners of EXCO GP Partners Old, LP are EXCO Resources,

Inc. and EXCO Partners GP, LLC.   The sole member of EXCO Partners GP, LLC is EXCO Resources, Inc.  Accordingly, EXCO Operating Company, LP is a citizen of Texas.

11.     Plaintiff EXCO Land Company, LLC is a Delaware limited liability company and wholly-owned subsidiary of EXCO Resources, Inc.  The sole member of EXCO Land Company, LLC is EXCO Operating Company, LP.   Accordingly, EXCO Land Company, LLC is a citizen of Texas.

12.     Defendant Chesapeake Energy Marketing, LLC is an Oklahoma limited liability company and its sole member is Defendant Chesapeake Energy Corporation.

13.     Defendant Chesapeake Energy Corporation is an Oklahoma corporation with its principal place of business at 6100 N. Western Avenue, Oklahoma City, Oklahoma 73118. Accordingly, Defendants Chesapeake Energy Corporation and Chesapeake Energy Marketing, LLC are both citizens of Oklahoma.

### III.     JURISDICTION AND VENUE

14.     The Court has subject-matter jurisdiction over this case because complete diversity of citizenship exists between Plaintiffs, who are citizens of Texas, and Defendants, who are citizens of Oklahoma, and because Plaintiffs seek damages in excess of $75,000 exclusive of interest and costs.  *See* 28 U.S.C. §§ 1332, 1441(b).

15.     This Court has personal jurisdiction over Chesapeake because Chesapeake has extensive contacts in Texas and transacts extensive business in Texas such that it is essentially at home in Texas.  Chesapeake also buys, sells, and markets natural gas in Texas, including the gas at issue in this case.  Moreover, this dispute arises out of Chesapeake's specific contacts with Texas and Plaintiffs on the facts alleged herein such that it should have reasonably anticipated being sued in Texas, and litigating in Texas will not offend traditional notions of fair play and substantial justice.

PLAINTIFFS' AMENDED COMPLAINT

16.     Venue is proper in the Dallas Division of the Northern District of Texas because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here.  *See* 28 U.S.C. § 1391(b)(2).  Venue is also proper because the Dallas Division of the Northern District of Texas is the district and division within which the underlying state court action was pending prior to removal by CEML.  *See* 28 U.S.C. §§ 1441(a), 124(a)(2); [DE 1-5].

### IV.     BACKGROUND

17.     On September 1, 2009 the Base Contract was executed by EXCO Production Company, LP, as seller, and Chesapeake Energy Marketing, Inc. ("CEMI"),[1] as buyer.  The Base Contract outlines the terms by which the parties buy and sell natural gas delivered to Chesapeake's receipt points.   Specific details regarding these transactions, including the quantities, duration, and purchase price paid by Chesapeake, are further specified in transaction confirmations exchanged by the parties under the terms of the Base Contract.  A true and correct copy of the Base Contract is attached hereto as Exhibit A.

18.     Here, Transaction Confirmation #7, covering deliveries between April 1, 2013 and June 30, 2032, sets the price/cost structure for gas purchased and identifies the delivery points.  Because the quantity of gas subject to Transaction Confirmation #7 is "All available at Delivery Point," Chesapeake is the exclusive purchaser of Raider's gas at the specified delivery points, which are on a single gas gathering system owned and operated by Mockingbird Midstream Gas Services, Inc. ("Mockingbird"), a subsidiary of Williams Partners, LP.  A true and correct copy of Transaction Confirmation #7 is attached hereto as Exhibit B.

---

[1] CEML later replaced CEMI as party to the Contracts.

**PLAINTIFFS' AMENDED COMPLAINT**

**A.      Raider Succeeds To The Contracts After An Internal Reorganization In 2016.**

19.      On August 18, 2016, EXCO Operating[2] underwent a divisive merger with Raider under Texas law.  As a result of the merger, Raider became the successor in interest to EXCO Operating under the Contracts.[3]

20.      On October 7, 2016, EXCO Operating notified Chesapeake in writing that the Contracts were now held and administered by Raider as a result of the merger.

21.      Regardless, Section 14.1 of the Base Contract permits a party to "transfer its interest to any parent or affiliate by assignment, merger or otherwise without the prior approval of the other party."

22.      Chesapeake did not object to EXCO Operating's notice that Raider held and administered the Contracts after the merger.

23.      The parties continued to perform under the Contracts after Raider became the seller.  Chesapeake paid Raider directly for the gas it purchased, and Raider paid Chesapeake for Raider's share of the transporting and processing fees for gas sold to Chesapeake under the Contracts.

24.      Pursuant to a separate agreement, Chesapeake also purchased from Raider the oil produced in conjunction with Raider's gas.  Chesapeake never objected to Raider becoming the seller of the oil under the relevant agreement.

**B.      Raider Seeks Chesapeake's Consent For Assignment To VOG Palo Verde LP.**

25.      Over six months later, on April 13, 2017,[4] Raider wrote to Chesapeake requesting consent to assign the Contracts to a third party, VOG Palo Verde, LP ("VOG").  VOG is a

---

[2] EXCO Operating succeeded to EXCO Production Company, LP's rights and obligations under the Contracts.
[3] Under Texas law, after such a merger takes effect "all rights, title, and interests to all . . . property . . . is allocated to and vested . . . in or more of the surviving or new organizations . . . without . . . any transfer or assignment having occurred[.]"  Tex. Bus. Org. Code § 10.008(2)(C).  Accordingly, the Contracts were not transferred or assigned to Raider, but were allocated to and vested in Raider by operation of law.

subsidiary of Venado Oil and Gas, LLC, an affiliate of KKR & Co., L.P.—one of the world's largest private equity firms—that agreed to purchase the South Texas oil and natural gas properties of EXCO Operating and EXCO Land, subsidiaries of EXCO Resources, including the Contracts, for approximately $300 million in a transaction that was to close on June 1st (the "VOG Transaction").[5]

26.     The Contracts were a material component of the VOG Transaction.

27.     On April 13th, Raider provided Chesapeake with information regarding the VOG Transaction in writing and requested consent by May 12th.

28.     Raider asked for Chesapeake's consent because Section 14.1 of the Base Contract provides: "No assignment of this Contract, in whole or in part, will be made without the prior written consent of the non-assigning party (and shall not relieve the assigning party from liability hereunder), which consent will not be unreasonably withheld or delayed[.]"

29.     Although Chesapeake continued to purchase Raider's gas, Chesapeake never responded to Raider or EXCO in response to Raider's request.

**C.     Chesapeake Demands A $25 Million Irrevocable Standby Letter Of Credit From EXCO Operating On 48 Hours' Notice.**

30.     On Thursday, May 25th, before the Memorial Day holiday weekend, and despite knowing that the Contracts would be sold to VOG in the VOG Transaction on June 1st, Chesapeake wrote to EXCO Operating—not Raider—stating that, pursuant to Section 10.1 of the Base Contract, "CEML has reasonable grounds for insecurity regarding EXCO [Operating's] performance of obligations under the [Base Contract]."  The letter went on to demand a $25 million irrevocable standby letter of credit from EXCO Operating within 48 hours and threatened

---

[4] Unless otherwise noted, events pled herein occurred in 2017.
[5] Raider is not a party to the purchase and sale agreement between EXCO Operating, EXCO Land, and VOG, but Raider is a party with respect to assignment of the Contracts.

that "Should Credit Assurance not be delivered to CEML's satisfaction within 48 hours of receipt, CEML may terminate one or more of the Transaction Confirmations associated with the Contract."

31.     Chesapeake gave no basis for its "reasonable grounds for insecurity," and there were none.  Chesapeake's demand was also surprising because (1) EXCO Operating was no longer a party to the Contracts as a result of the merger with Raider; (2) neither Raider nor any other EXCO Resources entity would hold the Contracts after June 1st due to the VOG Transaction; (3) the $25 million amount demanded by Chesapeake was extraordinarily high in light of Chesapeake's average monthly credit exposure to Raider; and (4) EXCO Operating, and then Raider, had delivered gas without fail and paid their respective shares of the transporting and processing costs associated with the gas under the agreed price/cost structure.

32.     Importantly, Chesapeake incorrectly addressed its demand letter to EXCO Operating even though it knew that Raider was the appropriate party to receive any notice under the Base Contract.  Indeed, by the time Chesapeake sent its demand letter, it had been purchasing gas from Raider for almost eight months.  Chesapeake, in any case, failed to follow the Base Contract's original notice provisions even as to EXCO Operating; it sent the demand letter to EXCO Operating's Vice President of Marketing at his work email address—not the person designated to receive notice under the Base Contract.

33.     There were no developments to support Chesapeake's unspecified concerns about the financial insecurity of Raider or EXCO Operating.

34.     The day after it received Chesapeake's letter, on Friday, May 26th, EXCO Operating informed Chesapeake in writing that Chesapeake's demand for adequate assurance was incorrectly addressed to EXCO Operating and should have been addressed to Raider.

EXCO Operating attached a copy of the October 7, 2016 letter notifying Chesapeake of the merger that caused Raider to hold and administer the Contracts.

35.     On Tuesday, May 30th,[6] Chesapeake again wrote to EXCO Operating, claiming for the first time that it did not recognize Raider as a party to the Base Contract and that Raider's relationship to EXCO was unclear—even though Chesapeake had been purchasing oil and gas from Raider for some time.  Chesapeake then went on to repeat its unspecified "reasonable grounds for insecurity" as to EXCO Operating and asserted the same unelaborated concern as to Raider, threatening this time to terminate one or more transaction confirmations if the $25 million irrevocable standby letter of credit was not provided on the same day.

36.     Chesapeake offered no reasons for its ostensible—and plainly fabricated—belief that it could refuse to recognize Raider's relationship to the Base Contract and Transaction Confirmation #7.  The plain language of Section 14.1 of the Base Contract does not require one party to seek prior approval from the other for transfers "to any parent or affiliate by assignment, merger or otherwise."

37.     Chesapeake still offered no rationale for demanding the excessive $25 million letter of credit.  Under the Contracts, Chesapeake's monthly credit exposure to Raider is approximately $1-$1.5 million.  By demanding a $25 million letter of credit, Chesapeake essentially required Raider to put up approximately two years of performance within 48 hours.  But Chesapeake made no mention of the fact that EXCO Operating, and then Raider, had performed pursuant to the Contracts for approximately four years.

38.     Chesapeake demanded the $25 million letter of credit not because of any credit concerns as to EXCO Operating or Raider, but solely to force Raider to renegotiate the terms of the Contracts that Chesapeake did not like.

---

[6] Monday, May 29th was Memorial Day.

**PLAINTIFFS' AMENDED COMPLAINT**

**D.      Chesapeake Purports To Terminate Transaction Confirmation #7.**

39.     On Wednesday, May 31st, Chesapeake sent a letter to EXCO Operating purporting to terminate Transaction Confirmation #7 because EXCO Operating had not provided a $25 million letter of credit, as Chesapeake had demanded the previous Thursday.

40.     EXCO Operating responded the same day to tell Chesapeake that it had again incorrectly addressed its letter to EXCO Operating and stating that "all future notices and communications regarding the [Base] Contract and Transaction [Confirmation] #7" should go to Raider.

41.     Later that day, Chesapeake wrote back to EXCO Operating and—for the first time—to Raider.  Chesapeake restated that it had terminated Transaction Confirmation #7 earlier in the day and again refused to recognize Raider as a party to the Base Contract.

**E.      Chesapeake Forces The Closure Of Receipt Points On The Mockingbird Gathering System, Cutting Off A Significant Volume Of Production.**

42.     Also on May 31st, Chesapeake instructed Mockingbird to immediately close all receipt points on the Mockingbird gathering system for gas from Raider.

43.     The Mockingbird gathering system is the only gathering system available to the wells that produce the gas Raider sells to Chesapeake.  Therefore, in order to transport Raider's gas from the well-head to market, the gas must go through the Mockingbird gathering system.

44.     Moreover, Chesapeake controls Raider's access to the Mockingbird gathering system.  Neither Raider nor any other subsidiary of EXCO Resources has a contract with Mockingbird to access the Mockingbird gathering system.  And if Raider cannot access the Mockingbird gathering system to transport and sell its gas, many of EXCO's oil wells must be shut-in because the gas is a byproduct of oil production.

45.     This is precisely what happened as a result of Chesapeake's improper termination of the Contracts and instruction to Mockingbird to immediately close all receipt points on its gathering system for gas from Raider:  EXCO was forced to shut in more than 70 wells.  These abrupt shut-ins required EXCO to scramble company and third-party resources on an emergency basis—a highly complex and risk-laden process—and to "flare" explosive sour gas.

46.     To mitigate the harm caused by Chesapeake's conduct, Raider sought to contract with Mockingbird directly for access to Mockingbird's gathering system.   Mockingbird expressed its willingness to contract directly with Raider, but Chesapeake successfully blocked these efforts by threatening to retaliate against Mockingbird if it did so.

**F.      Raider Demonstrates Adequate Assurance By Offering A Letter Of Credit, But Chesapeake Refuses To Accept It.**

47.     On Thursday, June 1st, Raider responded to Chesapeake's letter from the day before and notified Chesapeake that it would post a letter of credit to satisfy Chesapeake's demand for adequate assurance.  Raider asked Chesapeake to confirm the amount it desired.

48.     Raider received no response, but completed an application for an irrevocable standby letter of credit for $25 million from JPMorgan Chase Bank, N.A.

49.     That evening, however, Chesapeake's employee and representative, Sarika Jewell, called Raider's President and left a voicemail stating that—despite its previous representations—Chesapeake would *not* accept a letter of credit from Raider.  Jewell's voicemail establishes the fabricated nature of Chesapeake's invocation of the Base Contract's "Adequate Assurance" provision and professed confusion over whether Raider has rights under the Contracts.  Transcribed, the voicemail appears to read in full:

> Hey Steve [Estes, President of Raider].  This is Sarika Jewell with Chesapeake.  I'm calling regarding the letter that you guys, uh, just sent.  Um, I was hoping to connect with you.  Uh, we will not be responding, just keep back and forth, uh, with another letter.  Uh,

**PLAINTIFFS' AMENDED COMPLAINT**

we have a very strong, lot of evidence as to why your arguments are invalid.  I can give you very specific examples if needed.  Uh, we would really save you guys save, uh, monies and not, uh, bother to post the LC because we will not be accepting it.  If you want to talk any commercial solution in continuing to sell your gas, uh, we will entertain that, uh, but I think it's best that we get on a call and discuss this further.  So, uh, if you're interested, uh, please give me a call on my, um, office number.  You can reach me at my cell as well.  Thanks.

50.     As established by a proposed Transaction Confirmation #8 sent by Chesapeake to Raider on May 31st, Chesapeake's "business solution" would have required Raider to, among other things, forego the 15 years remaining on Transaction Confirmation #7 and instead deal with Chesapeake on a month-to-month basis—with Chesapeake having "sole discretion" to decide whether the arrangement would be extended.

51.     Despite Chesapeake's admission of its true motives and withdrawal of its demand for adequate assurance, Raider continued processing the letter of credit.

**G.     Chesapeake Did Not Respond To Raider's April 13th Request For Consent To Assign the Contracts to VOG.**

52.     Also on June 1st, Raider sent a letter to Chesapeake regarding Chesapeake's continued failure to respond to Raider's April 13th request for consent to assign the Contracts to VOG.  As explained in the letter, Plaintiffs learned through VOG that Chesapeake had discussed the VOG Transaction with VOG and that Chesapeake had informed VOG that it would not consent to the proposed sale and assignment of Raider's rights in the Contracts.

53.     Although it never responded to Raider, Chesapeake informed VOG that it was refusing consent to the VOG Transaction based on (1) unspecified credit concerns relating to *VOG* and (2) the purported failure of VOG to provide Chesapeake with a copy of the form of assignment of the Contracts.

54.     Importantly, Chesapeake refused to consent even after VOG (1) offered adequate assurance of performance in the form of a $9 million standby irrevocable letter of credit and, if requested, a guarantee—approximately nine months' worth of performance under the Contracts; (2) provided Chesapeake the form of assignment of the Contracts; and (3) gave Chesapeake detailed documentation about VOG and its parents showing that VOG would have ample liquidity—equal to almost five years' worth of performance under the Contracts—once the VOG Transaction closed on June 1st.

55.     In an effort to obtain improper leverage to renegotiate Transaction Confirmation #7, Chesapeake was desperate to seize on any pretext to refuse its consent to the proposed assignment of the Contracts to VOG.

56.     Chesapeake's conduct, described above, is in breach of its obligation under Section 14.1 of the Base Contract to not unreasonably withhold or delay its consent to an assignment.  Instead, Chesapeake breached its implied covenant of good faith and fair dealing, and abused its contractual right to consent to an assignment in hopes of forcing Raider to renegotiate Transaction Confirmation #7, under the threat of Chesapeake purportedly terminating Transaction Confirmation #7 and thereby killing the VOG Transaction.

57.     Absent Chesapeake's manufactured "Event of Default," the Base Contract's general termination provisions in Section 12 require Chesapeake to honor Transaction Confirmation #7 "until the expiration of the latest Delivery Period"—i.e., until June 30, 2032.

**H.     Chesapeake's Conduct Harmed Plaintiffs.**

58.     Plaintiffs have suffered severe harm as a direct result of Chesapeake's sudden and unexpected purported termination of the Contracts, its refusal to accept any of Raider's gas at the delivery points, and its instruction to Mockingbird to close the receipt points for Raider's gas.

PLAINTIFFS' AMENDED COMPLAINT

59.     Most prominently, the VOG Transaction did not close, and Raider and EXCO were denied the ability to maintain, exercise, and assign their valuable contractual rights.

## I.     Agency And Concerted Conduct

60.     The two Chesapeake entities—CEML and CEC—purported to act for each other pursuant to agency agreements or pursuant to actual custom and practice.  This applies to all of Chesapeake's statements and actions described herein.

61.     Many Chesapeake employees, officers, and agents work for and act on behalf of multiple Chesapeake entities and have multiple functions running across any formal lines between the CEML and CEC entities.

62.     For example, the employee who allegedly evaluated VOG's "creditworthiness" holds the same position and performs the same work for both CEML and CEC.  *See* Rubio Aff. ¶ 2 [DE 6-3].  That employee communicated with VOG using his CEC email account and signed his emails as the "Manager – Credit" for "Chesapeake Energy Corporation."  *See, e.g.*, Rubio Aff. Ex. 2 [DE 6-3].

63.     Other employees engaged in conduct material to Plaintiffs' claims in their capacities as agents of CEC, including a "Sr. Credit Analyst" who also communicated with VOG representatives about the VOG Transaction and VOG's "creditworthiness."  *See* Rubio Aff. Exs. 4–7 [DE 6-3].

64.     Additionally, much of the referenced correspondence was sent on "Chesapeake Energy" letterhead, written by officers and employees of CEC, CEML, or both, and includes the name and address of "Chesapeake Energy Corporation" at the bottom of the page.  *See, e.g.*, Rubio Aff. Ex. 9 [DE 6-3].

65. Such conduct shows as to all allegations herein that CEC and CEML acted in concert to injure Plaintiffs, that the conduct of the two entities often was indistinguishable or directed by CEC, and that CEC is independently liable to Plaintiffs.

## V.   CAUSES OF ACTION

### A.   Breach Of Contract (By Raider, Or Alternatively EXCO Operating, Against Chesapeake)

66. Plaintiffs adopt and incorporate their allegations set forth above.

67. Oklahoma law, which governs the Contracts, implies a duty of good faith and fair dealing on all contracting parties. This implied covenant ensures that neither party will act to injure the parties' reasonable expectations nor impair the rights or interest of the other party to receive the benefits flowing from the contractual relationship.

68. Section 10.1 of the Base Contract states that "If either party . . . has reasonable grounds for insecurity regarding the performance of any obligation under this Contract . . . by the other party . . . [that party] may demand Adequate Assurance of Performance."

69. Chesapeake demanded adequate assurance of performance from EXCO Operating, and eventually, Raider, without specifying—and, in fact, without having—any reasonable grounds for insecurity.

70. Moreover, of the options provided by Section 10.1 of the Base Contract for adequate assurance of performance, Chesapeake selected the one method that would be the most unreasonable and difficult to secure within 48 hours over the course of the Memorial Day weekend—a $25 million irrevocable standby letter of credit.

71. Chesapeake's bad faith in demanding a $25 million irrevocable standby letter of credit as the sole means of adequate assurance of performance is apparent considering (1) Chesapeake's failure to specify any reasonable grounds for insecurity; (2) Raider's and

VOG's independent offers to provide abundant assurance; and (3) Chesapeake's demand for a letter of credit in an amount and for a purpose far outside the economics of the Contracts.

72.    Chesapeake, in violation of its implied covenant, sought to use Section 10.1 of the Base Contract to gain leverage and to create a pretext to terminate Transaction Confirmation #7 if Raider refused to renegotiate on terms more favorable to Chesapeake.

73.    In so doing, Chesapeake breached Section 10.1 by demanding adequate assurance of performance (1) without any reasonable grounds for insecurity and (2) through a form of security that was unreasonable under the circumstances.

74.    Furthermore, Section 14.1 of the Base Contract states that "No assignment of this Contract, in whole or in part, will be made without the prior written consent of the non-assigning party (and shall not relieve the assigning party from liability hereunder), which consent will not be unreasonably withheld or delayed[.]"

75.    Raider requested, in writing, Chesapeake's consent to assign the Contracts on April 13, 2017.  Chesapeake did not respond to Raider's request for consent.

76.    However, Chesapeake told *VOG* that it would deny consent, for the pretextual reasons described above and after VOG (1) offered adequate assurance of performance and (2) provided Chesapeake with a copy of the form of assignment of the Contracts and with evidence of VOG's abundant liquidity.

77.    Chesapeake sought to use Section 14.1 to gain leverage, in combination with Section 10.1, over Raider in hopes of forcing Raider to renegotiate Transaction Confirmation #7 before assigning it or risk Chesapeake terminating it.  Chesapeake's conduct shows that any refusal to consent was for illegitimate purposes and frustrated the essential purposes of the Contracts.

PLAINTIFFS' AMENDED COMPLAINT

78.     Accordingly, Chesapeake also breached both the plain language of Section 14.1 and the implied covenant with respect to Section 14.1 by unreasonably delaying and withholding consent to Plaintiffs' requests to assign the Contracts.

79.     Chesapeake has committed the foregoing breaches of contract in bad faith and in breach of the implied covenant of good faith and fair dealing.

80.     Raider seeks its damages proximately caused by Chesapeake's wrongful termination and breaches of the Contracts, including the implied covenant of good faith and fair dealing.

81.     Raider also seeks its costs and attorney's fees pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code.

82.     In the alternative to damages for Raider's breach of contract claim, and Raider seeks specific performance under the Contracts.

83.     Section 12 of the Base Contract provides that it may only be terminated on "30 Day's written Notice, but shall remain in effect until the expiration of the latest Delivery Period of any transaction(s)."

84.     Chesapeake breached Section 12 of the Base Contract by purporting to terminate the Contracts without cause before "the expiration of the latest Delivery Period of [Transaction Confirmation #7]."

85.     Raider has performed and remains willing and able to perform its obligations under the Contracts.

86.     Because Chesapeake's purported termination of the Contracts was invalid and improper, Raider seeks specific performance requiring Chesapeake to perform its obligations under the Contracts consistent with Section 12 of the Base Contract.

87.     The Contracts are capable of present performance, indeed Chesapeake ceased its performance only for the pretextual reasons described above.

88.     The Contracts include precise terms, including a specific duration, and those terms are capable of enforcement.

89.     Solely in the alternative, Plaintiffs incorporate and restate the preceding paragraphs of Raider's claim for breach of contract against Chesapeake on behalf of EXCO Operating such that Chesapeake breached the Contracts as to EXCO Operating in the same manner as it breached the Contracts as to Raider.

**B.      Declaratory Relief (By Raider, Or Alternatively, EXCO Operating, Against Chesapeake)**

90.     Plaintiffs adopt and incorporate their allegations set forth above.

91.     Pursuant to 28 U.S.C. § 2201, Raider seeks a declaration that, under Section 10.1 of the Base Contract, Chesapeake had no reasonable grounds for insecurity regarding Raider's performance of the Contracts and, as a result, that no Event of Default occurred under Section 10.2 of the Base Contract.

92.     Raider seeks a declaration that the Contracts remain in force and have not been terminated as contemplated by Section 12 of the Base Contract.

93.     Raider also seeks a declaration that, under Section 14.1 of the Base Contract, Chesapeake unreasonably withheld its consent to the assignment of the Contracts to VOG.

94.     Solely in the alternative, Plaintiffs incorporate and restate the preceding paragraphs of Raider's claim for declaratory relief on behalf of EXCO Operating such that EXCO Operating seeks the same declaratory relief as Raider.

**C.      Tortious Interference With Existing Contract (By EXCO Against Chesapeake)**

95.     Plaintiffs adopt and incorporate their allegations set forth above.

96.     EXCO Operating and EXCO Land, both subsidiaries of EXCO Resources, had a valid contract with VOG, under which Raider's interests in the Contracts would be sold and assigned to VOG.

97.     Chesapeake knew about the VOG Transaction and contract between EXCO Operating, EXCO Land, and VOG because, among other things, Raider notified Chesapeake about the VOG Transaction and contract, and Chesapeake discussed them with VOG.

98.     Chesapeake willfully and intentionally interfered with the contract between EXCO Operating, EXCO Land, and VOG, without justification or privilege, by breaching the Base Contract with knowledge that doing so necessarily would cause the breach, hindrance, or substantial impairment of the contract between EXCO Operating, EXCO Land, and VOG. Chesapeake intended that precise result so that it could have additional leverage to renegotiate its obligations to Raider under the Contracts.

99.     Chesapeake's conduct proximately caused EXCO injury.  Among other things, the value and expected benefits of EXCO Operating and EXCO Land's contract with VOG were impaired by Chesapeake's breach of contract and instruction to Mockingbird to close the receipt points for Raider's gas.  Chesapeake's performance under the Contracts was an essential component of the contract between EXCO Operating, EXCO Land, and VOG.  EXCO also incurred substantial costs related to the shutting-in of the wells, such as the wasting of otherwise valuable gas through flaring and the scrambling of resources required to respond to the unexpected closure of the Mockingbird gathering system.

**D.     Tortious Interference With Prospective Business Relations (By EXCO Against Chesapeake)**

100.    Plaintiffs adopt and incorporate their allegations set forth above.

101.    If the transaction between EXCO Operating, EXCO Land (both subsidiaries of EXCO Resources), and VOG did not rise to the level of a recognized contract, EXCO pleads in the alternative that Chesapeake tortiously interfered with EXCO's prospective business relationship with VOG.

102.    Raider intended to assign its interest in the Contracts to VOG.  EXCO Operating, EXCO Land, and VOG drafted and finalized documents to effectuate that transaction.  EXCO Operating, EXCO Land and VOG intended to close the transaction on June 1st, but did not do so because of Chesapeake's purported termination on May 31st.  Accordingly, there was more than a reasonable probability—indeed, it was certain—that EXCO Operating, EXCO Land, and VOG would have entered a business relationship but for Chesapeake's conduct.

103.    Chesapeake intentionally interfered with the formation and consummation of EXCO Operating, EXCO Land, and VOG's business relationship.  Chesapeake knew about the pending relationship between EXCO Operating, EXCO Land, and VOG because, among other things, Raider notified Chesapeake about the VOG Transaction, and Chesapeake discussed the Transaction with VOG.

104.    Chesapeake's conduct was independently unlawful.  Chesapeake breached the Base Contract and purported to terminate Transaction Confirmation #7 in bad faith and with knowledge that doing so necessarily would prevent, hinder, frustrate, or substantially impair the consummation of EXCO Operating, EXCO Land, and VOG's business relationship.  Chesapeake intended that precise result so that it could have additional leverage to renegotiate its contractual obligations to Raider.

105.    Chesapeake's conduct proximately caused EXCO injury.  Among other things, the value and expected benefits of EXCO's business relationship with VOG were impaired by

Chesapeake's breach of contract and instruction to Mockingbird to close the receipt points for Raider's gas. The Contracts were essential components of the proposed business relationship between EXCO and VOG. EXCO also incurred substantial costs related to the shutting-in of the wells, such as the wasting of otherwise valuable gas through flaring and the scrambling of resources required to respond to the unexpected closure of the Mockingbird gathering system.

## VI.   CONDITIONS PRECEDENT

106.   All conditions precedent to Plaintiffs' claims for relief have been performed or have occurred, or were otherwise met, waived, or excused.

## VII.   JURY DEMAND

107.   Plaintiffs demand a jury trial on all issues so triable.

## VIII.   RELIEF REQUESTED

108.   Plaintiffs respectfully request that this Court:

a.   award Raider, or alternatively EXCO Operating, all damages proximately caused by Chesapeake's breaches of the Contracts and the implied duty of good faith and fair dealing;

b.   alternatively, to order specific performance of Chesapeake's obligations to Raider, or alternatively EXCO Operating, under the Contracts and specifically to abide by Section 12 of the Base Contract should Chesapeake desire to terminate the Contracts without cause;

c.   declare (1) that Chesapeake had no reasonable grounds for insecurity regarding Raider's, or alternatively EXCO Operating's, performance under the Contracts and, as a result, that no Event of Default occurred under Section 10.2 of the Base Contract, (2) that the Contracts remain in force and have not been terminated as contemplated by Section 12 of the Base Contract, (3) that Chesapeake unreasonably withheld and delayed its consent under Section 14.1 of the Base Contract to any assignment or transfer of the Contracts in the VOG Transaction;

d.   award EXCO actual, consequential, and exemplary damages for Chesapeake's tortious interference with contract, or alternatively interference with prospective business relations;

e.      award Plaintiffs their attorney fees, interest, and costs of suit pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code; and

f.      grant Plaintiffs all other relief, at law or equity, to which they may be entitled.


Date: August 1, 2017                              Respectfully submitted,

                                                  _/s/ Winn Carter _____
                                                  Winn Carter
                                                      Texas Bar No. 03932950
                                                      winn.carter@morganlewis.com
                                                  David Levy
                                                      Texas Bar No. 12264850
                                                      david.levy@morganlewis.com
                                                  T. Gregory Jackson
                                                      Texas Bar No. 24004718
                                                      greg.jackson@morganlewis.com
                                                  Aaron Christian
                                                      Texas Bar No. 24076089
                                                      aaron.christian@morganlewis.com
                                                  MORGAN, LEWIS & BOCKIUS LLP
                                                  1717 Main Street, Suite 3200
                                                  Dallas, Texas 75201
                                                  T.  214.466.4000
                                                  F.  214.466.4001

                                                  **COUNSEL FOR PLAINTIFFS**
                                                  **RAIDER MARKETING, LP,**
                                                  **EXCO RESOURCES, INC.,**
                                                  **EXCO OPERATING COMPANY, LP, and**
                                                  **EXCO LAND COMPANY, LLC**

## CERTIFICATE OF SERVICE

I, Winn Carter, certify that, on August 1, 2017, I electronically submitted the foregoing document to the United States District Court, Northern District of Texas, CM/ECF System.  The electronic case filing system will send a "Notice of Electronic Filing" to all counsel of record who have appeared in this case and are registered with that system, including counsel for Defendant.  I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

_/s/ Winn Carter___

Winn Carter